JO-ANN DARK-EYES *v.* COMMISSIONER OF
REVENUE SERVICES
(SC 17140)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued September 6, 2005—officially released January 3, 2006

*Mark T. Kelly,* with whom was *David Wayne Winters,* for the appellant (plaintiff).

*Richard Blumenthal,* attorney general, with whom was *Susan Quinn Cobb,* assistant attorney general, for the appellee (defendant).

*Kevin T. Kane,* state's attorney, and *Sarah E. Steere,* assistant state's attorney, filed a brief for the New London state's attorney's office as amicus curiae.

*David S. Williams* and *Donald Laverdue,* pro hac vice, filed a brief for the Mashantucket Pequot Tribe as amicus curiae.

*Lloyd L. Langhammer, Donald C. Baur,* pro hac vice, and *Jena A. MacLean,* pro hac vice, filed a brief for the town of Ledyard et al. as amici curiae.

*Opinion*

KATZ, J. The issue in this tax appeal is whether the plaintiff, Jo-Ann Dark-Eyes, an enrolled member of the federally recognized Mashantucket Pequot Tribe (tribe), was subject to state income tax on income she derived from sources within the tribe's reservation while living on property owned by the tribe and designated by the United States Congress as "private settlement lands" pursuant to the Mashantucket Pequot Indian Claims Settlement Act (settlement act), 25 U.S.C. §§ 1751 through 1760. The plaintiff appeals from the judgment rendered by the trial court dismissing her tax

appeal, which challenged the assessment of the 1996, 1997 and 1998 income taxes by the defendant, the commissioner of revenue services. The plaintiff principally claims that, because she resided in "Indian country," as that term is defined under 18 U.S.C. § 1151,[1] during the taxable years in question, she was exempt from state income tax. She also claims that: (1) the assessment of state income tax on enrolled members of the tribe living in the state violates the federal constitution, absent the express consent of Congress; and (2) the department of revenue services regulation under which the defendant determined that the plaintiff was not entitled to an exemption as an enrolled member of a federally recognized tribe is void due to an impermissible delegation of authority. We affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to our disposition of the plaintiff's appeal. In 1976, the tribe filed a lawsuit in which it asserted aboriginal or tribal title to land in and around the town of Ledyard claiming that, in 1855, approximately 800 acres of land had been conveyed out of tribal hands without congressional approval, in violation of the nonintercourse provisions of the Trade and Intercourse Act of 1790 (now codified at 25 U.S.C. § 177), thereby placing a cloud on the title to privately and publicly held land. The tribe, the affected private landholders and the state negotiated a tentative settlement that included, inter alia, extinguishing the tribe's aboriginal claims to the disputed land in exchange for federal

---

[1] The term "Indian country" is defined by 18 U.S.C. § 1151 as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

recognition of the tribe, fee simple title to certain reservation lands and the establishment of a fund to purchase land from willing sellers within a designated 800 acre area in Ledyard (private settlement lands). In 1983, Congress enacted the settlement act to embody the agreement reached by the parties, thus authorizing the appropriation of settlement funds. 25 U.S.C. § 1754 (a).[2] The settlement funds were available for the funding of economic development and for the purchase of private settlement lands, which, by operation of the act, were to be held in trust by the United States for the tribe's benefit. 25 U.S.C. § 1754 (a) and (b). The act imposed a January, 1985 deadline for drawing on the fund for the purchase of the private settlement lands, after which time unused funds were to be disbursed for use toward economic development for the tribe. 25 U.S.C. § 1754 (b) (2).

In 1993, the tribe purchased with nonsettlement moneys property located at 59 Coachman Pike in Ledyard (Coachman property), which was located within the area designated under the settlement act as private settlement lands. The plaintiff, a Connecticut resident and an enrolled member of the tribe, resided on the Coachman property from November 1, 1993, through September 30, 1998. The tribe held title to the Coachman property in fee simple until August 25, 1998, at which time, pursuant to a petition filed by the tribe under 25 U.S.C. § 465,[3] a provision of the Indian Reorganization

---

[2] See footnote 14 of this opinion for the relevant text of 25 U.S.C. § 1754.

[3] "Enacted in 1934, the [Indian Reorganization Act, 25 U.S.C. §§ 461 through 469] fundamentally restructured the relationship between Indian tribes and the federal government, reversing the [n]ineteenth [c]entury goal of assimilation and embodying principles of tribal self-determination and self-governance. . . . [T]he [Indian Reorganization Act] authorizes the [Secretary of the Interior (Secretary)] to take certain lands into trust for the benefit of an Indian tribe. See 25 U.S.C. § 465. The procedures governing the Secretary's exercise of discretion in this regard are set forth in Department of Interior regulations." (Citation omitted; internal quotation marks omitted.) *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, 228 F.3d 82, 85 (2d Cir. 2000), cert. denied, 532 U.S. 1007, 121 S. Ct. 1732, 149

Act, the United States government accepted the property into trust for the tribe's benefit as a part of the tribe's reservation.

During 1996, 1997 and 1998 (taxable years), the plaintiff earned income from the Mashantucket Pequot Tribal Council. For each of the taxable years, she filed a Connecticut resident tax return claiming that she was exempt from the state income tax as an enrolled member of the tribe who resided in and earned her income from sources within Indian country.[4]

The defendant rejected the plaintiff's claim, the department of revenue services (department) having found that the Coachman property was not Indian country until it was taken into trust by the United States government in August, 1998.[5] The department first acknowledged that, in accordance with § 12-702 (c) (1)-3 of the Regulations of Connecticut State Agencies,[6]

L. Ed. 2d 657 (2001). "When the Secretary takes land into trust for the use of Indians pursuant to the [Indian Reorganization Act] of 1934, the land is held under the superintendence of the [f]ederal [g]overnment and is ordinarily exempt from certain state laws, including (1) state or local taxation, see 25 U.S.C. § 465; (2) local zoning and regulatory requirements, see 25 C.F.R. § 1.4 (a); or, (3) state criminal and civil jurisdiction, unless the tribe consents to such jurisdiction, see 25 U.S.C. §§ 1321 (a), 1322 (a)." (Internal quotation marks omitted.) *Carcieri* v. *Norton*, 423 F.3d 45, 59 n.4 (1st Cir. 2005).

[4] In 1998, the plaintiff relocated from the Coachman property to property located at Shewville Road in Ledyard, land also owned in fee by the tribe, but located outside the private settlement land boundaries. Initially, she also claimed a tax exemption for the time during which she resided on Shewville Road; however, the department's denial of an exemption during her Shewville Road residency was not a subject of her appeal to the trial court.

[5] The defendant had granted the plaintiff's request for a refund for 1995, but thereafter took the position that the refund was issued in error. The defendant decided that he would take no further action to recover that tax, however, due to the expiration of the statute of limitations.

[6] Section 12-702 (c) (1)-3 of the Regulations of the Connecticut State Agencies addresses the taxation of enrolled members of a federally recognized tribe and provides in relevant part: "(a) In general. Income of an enrolled member of a federally recognized tribe is exempt from Connecticut income tax as long as the member (i) resides in Indian country and (ii) only has income that is derived from or connected with sources within Indian

which defines Indian country in accordance with the

country. Income of an enrolled member of a federally recognized tribe is subject to Connecticut income tax in the same manner as if the person were not an enrolled member if the member does not reside in Indian country. See *McClanahan* v. *State Tax Commission*, 411 U.S. 164 [93 S. Ct. 1257, 36 L. Ed. 2d 129] (1973), *White Mountain Apache Tribe* v. *Bracket*, 448 U.S. 136 [100 S. Ct. 2578, 65 L. Ed. 2d 665] (1980) and *Oklahoma Tax Commission* v. *Sac and Fox Nation*, 508 U.S. [114, 113 S. Ct. 1985] 124 L. Ed. 2d 30 (1993).

"(b) Unmarried member residing in Indian country. Every enrolled member who is unmarried and who resides in Indian country located within Connecticut—

"(1) all of whose Connecticut adjusted gross income is derived from or connected with sources within Indian country, shall be exempt from Connecticut income tax. Such member shall file a Connecticut income tax return and write 'exempt under section 12-702 (c) (1)-3 (b)' thereon.

"(2) only some of whose Connecticut adjusted gross income is derived from or connected with sources within Indian country, shall be subject to Connecticut income tax. His or her Connecticut income tax liability shall be determined by multiplying his or her Connecticut income tax liability calculated as if he or she were not an enrolled member by a fraction, the numerator of which is Connecticut adjusted gross income that is not derived from or connected with sources within Indian country and the denominator of which is Connecticut adjusted gross income. Such member shall write 'subject to tax under section 12-702 (c) (1)-3 (b)' on his or her Connecticut income tax return.

"(c) Unmarried member not residing in Indian country. Every enrolled member who is unmarried and who does not reside in Indian country, shall be subject to Connecticut income tax in the same manner as if he or she were not an enrolled member of a federally recognized tribe. . . .

"(g) Definitions. For purposes of this section:

"(1) 'Enrolled member' means an enrolled member of a federally recognized tribe.

"(2) 'Indian country' means Indian country, as defined in 18 U.S.C. § 1151.

"(3) 'Derived from or connected with sources within Indian country' is to be so construed so as to accord with the definition of the term 'derived from or connected with sources within this state' set forth in Part II in relation to the adjusted gross income of a nonresident individual.

"(4) 'Connecticut adjusted gross income that is not derived from or connected with sources within Indian country' means the difference remaining after Connecticut adjusted gross income derived from or connected with sources within Indian country is subtracted from Connecticut adjusted gross income.

"(h) While this section pertains to Section 12-702 (c) (1) of the general statutes, for purposes of supplementary interpretation, as the phrase is used in Section 12-2 of the general statutes, the adoption of this section is authorized by Section 12-740 (a) of the general statutes."

federal definition of that term under 18 U.S.C. § 1151, "income earned by enrolled members of a federally recognized tribe who reside in Indian country and whose income is derived from or connected with sources within Indian country is exempt from Connecticut income tax." See Regs., Conn. State Agencies § 12-702 (c) (1)-3 (a). The department concluded, however, that a narrower definition of Indian country than that generally applied under § 1151 applies to this particular tribe, limiting Indian country to "only those settlement lands (as defined in the [settlement act] . . .) that have been taken in trust by the United States for the benefit of the Mashantucket Pequot Tribe as part of the reservation."[7] (Citation omitted.) The plaintiff filed an administrative appeal from the ruling, and by letter, which constituted a "determination or disallowance of the [defendant]," the appellate division issued a final determination upholding the denial of the exemption.

[7] In reaching its decision, the department relied on its Informational Publication 99(29), entitled "Connecticut Income Tax Obligations of Enrolled Members of The Mashantucket Pequot Tribe," which provides in relevant part: "The term Indian country is used and defined under federal law. Generally, it means all lands within the limits of any Indian reservation under the jurisdiction of the Federal Government and all dependent Indian communities.

"With respect to the Mashantucket Pequot Tribe, however, a federal district court judge has held that Indian country of the Mashantucket Pequot Tribe is only those settlement lands (as defined in the Connecticut Indian Land Claims Settlement Act; section 1751 of title 25 of the United States Code) that have been taken in trust by the United States for the benefit of the Mashantucket Pequot Tribe as part of the reservation. . . . Consequently, only enrolled members of the Mashantucket Pequot Tribe residing on settlement lands that have been taken into trust by the United States for the benefit of the Tribe as part of the reservation are considered to be residing in Indian country of the Mashantucket Pequot Tribe." In their stipulated facts, the parties agree that the federal District Court case referred to in the department's publication is *Connecticut* v. *Babbit*, 26 F. Sup. 2d 397 (D. Conn. 1998), rev'd sub nom. *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, 228 F.3d 82 (2d Cir. 2000), cert. denied, 532 U.S. 1007, 121 S. Ct. 1732, 149 L. Ed. 2d 657 (2001).

The plaintiff then appealed from the department's decision to the Superior Court pursuant to General Statutes § 12-730.[8] The parties filed cross motions for summary judgment and a stipulation of facts, on which the trial court rendered judgment in favor of the defendant dismissing the appeal, concluding that the plaintiff was not exempt from state income tax because she did not reside in Indian country during the period at issue. The trial court first reasoned that, under the settlement act, property within the private settlement lands that was purchased with the tribe's moneys, as opposed to settlement funds, could not become part of the tribal reservation unless and until the United States took the land into trust for the tribe under § 465 of the Indian Reorganization Act. The court, therefore, determined that the Coachman property was not part of the tribe's reservation during the taxable years. The trial court then concluded that Indian country, under the settlement act, encompasses only the tribe's reservation and, accordingly, the Coachman property was not Indian country during the period in question. The court also rejected the plaintiff's contention that the property was a "dependent Indian community" and, therefore, Indian country as defined generally under § 1151 (b). It reasoned that: (1) the Coachman property "ha[d] not been set aside by the federal government for the use of the [tribe] as Indian land"; and (2) although the tribe had the option of transferring the Coachman property to be held in trust by the United States during the taxable years, the federal government did not exercise the type of active control over that property required for the tribe to be considered dependent during that period.

---

[8] General Statutes § 12-730 provides in relevant part: "[A]ny taxpayer aggrieved because of any determination or disallowance by the commissioner under section 12-729, 12-729a or 12-732 may . . . take an appeal therefrom to the superior court . . . ."

Accordingly, the trial court dismissed the plaintiff's appeal. This appeal followed.[9]

On appeal, the plaintiff principally claims that the trial court improperly concluded that the Coachman property was not Indian country prior to being taken into trust because the court: (1) failed to apply the definition of Indian country under 18 U.S.C. § 1151, which includes dependent Indian communities; and (2) concluded that, even if § 1151 could apply, the property was not a dependent Indian community. The plaintiff also claims that the trial court improperly failed to conclude that the state's assessment of an income tax

[9] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). Oral argument in this appeal initially was scheduled for November, 2004. In light of the United States Supreme Court's pending decision in *Sherrill* v. *Oneida Indian Nation of New York*, 544 U.S. 197, 125 S. Ct. 1478, 161 L. Ed. 2d 386 (2005), a case that raised issues that could bear on our resolution of the present appeal, we marked the case over until the September, 2005 term and thereafter issued an order directing the parties to submit supplemental briefs addressing the effect, if any, of *Sherrill* on this appeal. In *Sherrill*, the Oneida tribe had sought declaratory and injunctive relief barring the city of Sherrill's assessment of property taxes on the ground that the tribe's recent acquisition of fee title to discrete parcels of historic reservation land revived its ancient sovereignty over each parcel as it was required by the tribe. Id., 202–203. The Supreme Court ultimately did not address the substantive issues raised in the lower court, which included determinations as to whether the parcels of land qualified as "Indian country" under 18 U.S.C. § 1151, but instead decided against the tribe under the common-law equitable doctrine of laches in light of the fact that the tribe had not occupied the reservation lands for two centuries and since that time the land had been subject to state and local taxation. Id., 220–21; see id., 202–203 ("Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the [Oneida tribe's] long delay in seeking judicial relief against parties other than the United States, we hold that the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The [tribe] long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders."). In light of the court's focus on laches in that case, we conclude that the holding in *Sherrill* does not inform our analysis in the present case.

on enrolled members of the tribe living in the state violates the federal constitution and constitutes an impermissible delegation of authority to the defendant.[10]

The defendant counters that the settlement act provides a narrower definition of Indian country supplanting the broader definition under § 1151 that generally is applied under federal law. The defendant contends that the Coachman property is not Indian country under the settlement act because the property was not purchased with settlement funds and thereby automatically taken into trust, as required under that act. The defendant further claims that, even if the broader definition of Indian country under § 1151 controls, the Coachman property does not constitute a dependent Indian community under that section, as claimed by the plaintiff. Finally, the defendant contends that the assessment of income tax neither was unconstitutional nor an ultra vires act. Upon a review of the settlement act and other relevant federal authorities, we agree with the defendant that the Coachman property did not constitute Indian country during the taxable years in question. We also reject the plaintiff's secondary claims.

As a preliminary matter, we set forth the applicable standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted

---

[10] The trial court did not reach the plaintiff's claims regarding impermissible delegation and violation of the federal constitution, although they were raised and briefed by the parties. We decide these issues nevertheless because "[u]nder circumstances where the record presents the entire proceedings before the trial court, the question is essentially one of law, and we are in no different position than we would be in had the trial court answered it, we have considered, on its merits, the question thus left undecided." (Internal quotation marks omitted.) *Biller Associates* v. *Route 156 Realty Co.*, 52 Conn. App. 18, 25, 725 A.2d 398 (1999), aff'd, 252 Conn. 400, 746 A.2d 785 (2000).

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing . . . that the party is . . . entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 733, 873 A.2d 898 (2005). Finally, because this case distills to an issue of statutory interpretation, our review of that issue of law is plenary. *Barrett* v. *Montesano*, 269 Conn. 787, 792, 849 A.2d 839 (2004).

I

As the parties' claims suggest, this appeal turns on a fundamental distinction—whereas citizens generally are not exempt from the payment of state taxes, members of a recognized tribe deriving their income from tribal sources generally are exempt from such taxes if they live in Indian country.[11] Thus, the dispositive question is whether the Coachman property qualified as Indian country during the period in question, prior to the United States government taking the property into trust.

To make that determination, we first set forth the pertinent general principles of statutory construction and certain specific principles applicable to the construction of Indian law. In light of those principles, we

---

[11] The parties do not dispute that the income earned by the plaintiff from the tribe was income derived from or connected with sources within Indian country. Nor do the parties dispute that the plaintiff qualifies for a tax exemption on income from the tribe that was earned after the Coachman property was taken into trust, but while she still was residing there.

next determine the meaning of Indian country applicable to this appeal, namely, whether the general definition set forth under § 1151 applies or whether the settlement act supplants that definition and sets forth a narrower definition that applies to the Coachman property. Finally, we determine whether the Coachman property satisfied the applicable definition of Indian country prior to the federal government taking it into trust.

## A

"With respect to the construction and application of federal statutes, principles of comity and consistency require us to follow the plain meaning rule for the interpretation of federal statutes because that is the rule of construction utilized by the United States Court of Appeals for the Second Circuit. . . . Moreover, it is well settled that [t]he decisions of the Second Circuit Court of Appeals carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts." (Citations omitted; internal quotation marks omitted.) *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 474–75, 881 A.2d 259 (2005). Accordingly, our analysis of the pertinent federal statutes "begins with the plain meaning of the statute." *United States* v. *Ripa*, 323 F.3d 73, 81 (2d Cir. 2003); accord *In re Caldor Corp.*, 303 F.3d 161, 167–68 (2d Cir. 2002) ("[a]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute" [internal quotation marks omitted]). If the meaning of the text is not plain, however, "we must look to the statute as a whole and construct an interpretation that comports with its primary purpose and does not lead to anomalous or unreasonable results. See *American Tobacco Co.* v. *Patterson*, 456 U.S. 63, 71, 102 S. Ct. 1534, 71 L. Ed. 2d 748 (1982) (Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.);

*Castellano* v. *City of New York*, 142 F.3d 58, 67 (2d Cir. 1998) (Where the language is ambiguous, we focus upon the broader context and primary purpose of the statute.)." (Internal quotation marks omitted.) *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, 228 F.3d 82, 89 (2d Cir. 2000), cert. denied, 532 U.S. 1007, 121 S. Ct. 1732, 149 L. Ed. 2d 657 (2001).

When interpreting statutes implicating Indian affairs, however, "[a]s the [United States] Supreme Court has often reiterated, the standard principles of statutory construction do not have their usual force in cases involving Indian law. . . . [S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit. . . . In determining [congressional] intent, we are cautioned to follow the general rule that doubtful expressions are to be resolved in favor of [those] who are the wards of the nation, dependent upon its protection and good faith."[12] (Citations omitted; internal quotation marks

---

[12] We are mindful that the United States Supreme Court has stated recently that the Indian construction canon is not a mandatory rule, but a guide that "need not be conclusive." (Internal quotation marks omitted.) *Chickasaw Nation* v. *United States*, 534 U.S. 84, 94, 122 S. Ct. 528, 151 L. Ed. 2d 474 (2001). The court noted that canons "are designed to help judges determine the Legislature's intent as embodied in particular statutory language." Id. In *Chickasaw Nation*, the court chose not to apply the canon, finding that the statute before it was not "fairly capable of two interpretations . . . ." (Internal quotation marks omitted.) Id. *Chickasaw Nation*, however, can by no means be read as a complete rejection of the canon and, indeed, the canon continues to be applied. See, e.g., *Carcieri* v. *Norton*, 423 F.3d 45, 66 (1st Cir. 2005); *Grand Traverse Band of Ottawa & Chippewa Indians* v. *Office of the United States Attorney for the Western District of Michigan*, 369 F.3d 960, 971 (6th Cir. 2004).

We also note that the Second Circuit Court of Appeals has rejected the state's contention that the Indian canon of construction has no application to the settlement act and this tribe because of the tribe's tremendous wealth. See *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, supra, 228 F.3d 93. Noting that "the economic power and legal acumen of the [tribe] bears no discernible resemblance to that of the Indian tribes on whose behalf the Indian canon of construction was first developed"; id., 92; the court held that this does not strip the Indian canon of its force because the canon is applied even when Indians are at no practical disadvantage.

omitted.) Id., 92; see also *HRI, Inc.* v. *Environmental Protection Agency*, 198 F.3d 1224, 1246 (10th Cir. 2000) (reaffirming that federal executive is to consider its strict fiduciary obligation when interpreting regulations that directly affect its administration of Indian lands); *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter*, 217 Conn. 612, 620, 587 A.2d 139 (1991) ("Certain special principles of statutory construction apply to federal Indian law. Ambiguities in statutes concerning dependent tribes are to be resolved in favor of the Indians. . . . State jurisdiction over reservations, historically, is strongly disfavored." [Internal quotation marks omitted.]).

With respect to questions of jurisdiction, as we have noted in previous decisions, "[t]he United States has the authority to regulate Indian affairs pursuant to the Indian commerce clause of the United States constitution. U.S. Const., art. I, § 8, cl. 3; see *White Mountain Apache Tribe* v. *Bracker*, 448 U.S. 136, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980)." *Charles* v. *Charles*, 243 Conn. 255, 259, 701 A.2d 650 (1997), cert. denied, 523 U.S. 1136, 118 S. Ct. 1838, 140 L. Ed. 2d 1089 (1988). In light of this constitutional delegation of authority to the federal government, certain principles have been elucidated by the United States Supreme Court that bear on the states' exercise of jurisdiction over Indian affairs generally and taxation specifically. A state is without jurisdiction to subject a tribal member who is living in Indian country and deriving income from reservation sources to a state income tax absent an express authorization from Congress. *Oklahoma Tax*

---

Id. Moreover, the Second Circuit noted that the tribe's present wealth postdates the settlement act: "At the time of enactment in 1983, the conditions of the [tribe] were more consistent with the premise underlying the Indian canon of statutory construction. Even if [the court] would endorse [the state's] view that the Indian canon of construction applies with less force to statutes or treaties negotiated with a wealthy, powerful, and well-represented Indian tribe, it has no application here." Id., 93.

*Commission* v. *Sac & Fox Nation*, 508 U.S. 114, 123, 113 S. Ct. 1985, 124 L. Ed. 2d 30 (1993). The Supreme Court, however, "recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country." *Kiowa Tribe of Oklahoma* v. *Mfg. Technologies, Inc.*, 523 U.S. 751, 755, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998). Thus, in considering whether the state possesses authority to tax, "it must be determined whether the relevant tribal members live in Indian country . . . ." *Oklahoma Tax Commission* v. *Sac & Fox Nation*, supra, 126; see id., 124–25 (relevant boundary for taxing jurisdiction is not perimeter of formal reservation, but, rather, all land set aside for tribe or its members).

## B

Our analysis of the issue in the present case begins with the settlement act, enacted by Congress in 1983. The settlement act extinguished the tribe's aboriginal claims to hundreds of acres of land and, "[i]n exchange, (1) provided for federal recognition of the Tribe, see [25 U.S.C.] § 1758;[13] (2) established a $900,000 fund . . . designed principally for the purchase of private prop-

[13] Section 1758 of title 25 of the United States Code provides: "(a) Applicability of United States laws and regulations

"Notwithstanding any other provision of law, Federal recognition is extended to the Tribe. Except as otherwise provided in this subchapter, all laws and regulations of the United States of general application to Indians or Indian nations, tribes or bands of Indians which are not inconsistent with any specific provision of this subchapter shall be applicable to the Tribe.

"(b) Filing of organic governing document and amendments

"The Tribe shall file with the Secretary a copy of its organic governing document and any amendments thereto. Such instrument must be consistent with the terms of this subchapter and the [settlement act] to Implement the Settlement of the Mashantucket Pequot Indian Land Claim as enacted by the State of Connecticut and approved June 9, 1982.

"(c) Eligibility for services and benefits

"Notwithstanding any other provision of law, the Tribe and members of the Tribe shall be eligible for all Federal services and benefits furnished to federally recognized Indian tribes as of October 18, 1983."

erty, see [25 U.S.C.] § 1754;[14] and (3) identified bound-

[11] Section 1754 of title 25 of the United States Code provides in relevant part: "(a) Establishment and administration

"There is hereby established in the United States Treasury an account to be known as the Mashantucket Pequot Settlement Fund (hereinafter referred to in this section as the 'Fund'). The Fund shall be held in trust by the Secretary for the benefit of the Tribe and administered in accordance with this subchapter.

"(b) Expenditure of Fund; private settlement lands; economic development plan; acquisition of land and natural resources

"(1) The Secretary is authorized and directed to expend, at the request of the Tribe, the Fund together with any and all income accruing to such Fund in accordance with this subsection.

"(2) Not less than $600,000 of the Fund shall be available until January 1, 1985, for the acquisition by the Secretary of private settlement lands. Subsequent to January 1, 1985, the Secretary shall determine whether and to what extent an amount less than $600,000 has been expended to acquire private settlement lands and shall make that amount available to the Tribe to be used in accordance with the economic development plan approved pursuant to paragraph (3).

"(3) (A) The Secretary shall disburse all or part of the Fund . . . (excepting the amount reserved in paragraph [2]) according to a plan to promote the economic development of the Tribe.

"(B) The Tribe shall submit an economic development plan to the Secretary and the Secretary shall approve such plan within sixty days of its submission if he finds that it is reasonably related to the economic development of the Tribe. . . .

"(5) As the Fund or any portion thereof is disbursed by the Secretary in accordance with this section, the United States shall have no further trust responsibility to the Tribe or its members with respect to the sums paid, any subsequent expenditures of these sums, or any property other than private settlement lands or services purchased with these sums. . . .

"(7) Lands or natural resources acquired under this subsection which are located within the settlement lands shall be held in trust by the United States for the benefit of the Tribe.

"(8) Land or natural resources acquired under this subsection which are located outside of the settlement lands shall be held in fee by the Mashantucket Pequot Tribe, and the United States shall have no further trust responsibility with respect to such land and natural resources. Such land and natural resources shall not be subject to any restriction against alienation under the laws of the United States.

"(9) . . . [T]he Secretary may acquire land or natural resources . . . only if the Secretary and the ostensible owner of the land or natural resources have agreed upon the identity of the land or natural resources to be sold and upon the purchase price and other terms of sale. Subject to the agreement required by the preceding sentence, the Secretary may institute

aries within which lands acquired by the Tribe would be held in trust by the Secretary [of the Interior] and would constitute the Tribe's reservation, the so-called settlement lands, see [25 U.S.C. §] 1752 (3), (4) [and] (7)."[15] *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, supra, 228 F.3d 86.

The settlement act defines the tribe's reservation as "the existing reservation of the Tribe as defined by . . . the Connecticut General Statutes and any settlement lands taken in trust by the United States for the Tribe."[16] 25 U.S.C. § 1752 (7). "Settlement lands" are, in turn,

condemnation proceedings in order to perfect title, satisfactory to the Attorney General, in the United States and condemn interests adverse to the ostensible owner. . . .

"(d) Documentation of relinquishment of tribal claims

"The Secretary may not expend on behalf of the Tribe any sums deposited in the Fund established pursuant to subsection (a) of this section unless and until he finds that authorized officials of the Tribe have executed appropriate documents relinquishing all claims to the extent provided by sections 1753 and 1759 of this title, including stipulations to the final judicial dismissal with prejudice of its claims.

"(e) Authorization of appropriation

"There is authorized to be appropriated $900,000 to be deposited in the Fund."

[15] Section 1752 (3) of title 25 of the United States Code defines " 'private settlement lands' " as "(A) the eight hundred acres, more or less, of privately held land which are identified by a red outline on a map filed with the secretary of the State of Connecticut in accordance with the agreement referred to in section 1751(d) of this title, and

"(B) the lands known as the Cedar Swamp which are adjacent to the Mashantucket Pequot Reservation as it exists on October 18, 1983 . . . ."

Section 1752 (4) of title 25 of the United States Code defines " 'settlement lands' " as "(A) the lands described in sections 2(a) and 3 of the Act To Implement the Settlement of the Mashantucket Pequot Indian Land Claims as enacted by the State of Connecticut and approved on June 9, 1982, and

"(B) the private settlement lands."

Section 1752 (7) of title 25 of the United States Code defines " 'reservation' " as "the existing reservation of the Tribe as defined by chapter 824 of the Connecticut General Statutes and any settlement lands taken in trust by the United States for the Tribe."

[16] The "existing reservation of the Tribe" was defined by chapter 824 of the Connecticut General Statutes, particularly General Statutes § 47-63, and apparently included approximately 180 to 200 acres of land in Ledyard.

defined to include approximately twenty acres of land contributed by the state as well as "private settlement lands." 25 U.S.C. § 1752 (4); see also Special Acts 1982, No. 82-31, §§ 2 (a) and 3.[17] Private settlement lands are defined as "eight hundred acres, more or less, of privately held land," as identified on a map filed with the state; 25 U.S.C. § 1752 (3) (A); and lands adjacent to the tribe's historic reservation known as Cedar Swamp. 25 U.S.C. § 1752 (3) (B). As we have noted previously, the Coachman property is located within those 800 acres designated as "private settlement lands."

The settlement act also delineates the scope of the relationship between the tribe and the state with respect to the reservation lands, including those private settlement lands taken into trust, by providing, inter alia, that "[n]otwithstanding the provision relating to a special election in . . . the [Indian Civil Rights Act; 25 U.S.C. § 1326], the reservation of the Tribe is declared to be Indian country subject to State jurisdiction to the maximum extent provided in title IV of such Act . . . ." 25 U.S.C. § 1755. This section contains the only reference to Indian country in the settlement act. More generally, however, the settlement act also prescribes that "all laws and regulations of the United States of general application to Indians or Indian nations, tribes or bands of Indians which are not inconsistent with any specific

[17] The Connecticut legislature also enacted an act to implement the settlement agreement that confirmed certain lands as a reservation, provided for the conveyance of lands to be added to the reservation, and provided that "[n]one of the lands of the reservation . . . shall be subject to taxation by the state or any subdivision thereof." Special Act 82-31, § 2 (c). "Reservation" is defined in that act as "the Mashantucket Pequot reservation in the town of Ledyard, owned by the Mashantucket Pequot tribe or held in trust by the United States for said tribe, including those lands conveyed to the tribe . . . by deed in May, 1896, and those lands conveyed to or acquired by said tribe as part of the settlement of its land claims in the town of Ledyard." Id., § 1.

provision of [the settlement act] shall be applicable to the Tribe." 25 U.S.C. § 1758 (a). It is the relationship between these two provisions that gives rise to the first issue that we must address.

The plaintiff contends that the settlement act does not define Indian country and, therefore, § 1758 of the settlement act dictates that the generally applicable definition of Indian country under federal law set forth at 18 U.S.C. § 1151 controls our determination as to whether the Coachman property was Indian country before being taken into trust.[18] Section 1151 provides in relevant part: "[T]he term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent . . . (b) all dependent Indian communities within the borders of the United States . . . and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." The plaintiff contends that the Coachman property constituted a dependent Indian community before being taken into trust and, therefore, was Indian country.

The defendant claims that § 1151 does not apply because it is inconsistent with a narrower definition set forth in the settlement act, which does not include dependent Indian communities and is limited to the lands designated under the act as the tribe's reservation. Specifically, the defendant points to the phrase in the settlement act that provides that "the reservation of the Tribe is declared to be Indian country . . . ." 25 U.S.C.

---

[18] Although § 1151 refers to criminal jurisdiction, it generally applies as well to questions of civil jurisdiction. See *Alaska* v. *Native Village of Venetie Tribal Government*, 522 U.S. 520, 527, 118 S. Ct. 948, 140 L. Ed. 2d 30 (1998) ("[a]lthough this definition by its terms relates only to federal criminal jurisdiction, we have recognized that it also generally applies to questions of civil jurisdiction such as the one at issue here").

§ 1755. The defendant notes that the "reservation" is defined in the settlement act as "the existing reservation of the Tribe . . . and any settlement lands taken in trust by the United States for the Tribe." 25 U.S.C. § 1752 (7). Thus, the defendant contends that, because only the tribe's reservation qualifies as Indian country, and the settlement lands are included in the reservation only if they are taken into trust, the Coachman property could not be considered Indian country until it was taken into trust and thereby made part of the reservation. We agree with the plaintiff that § 1151 sets forth the applicable definition of Indian country.

The issue is whether § 1151, which clearly and expressly defines Indian country, is inconsistent with, and therefore supplanted by, the settlement act, specifically, § 1755. "In interpreting a statute, we begin with the language of the statute itself." (Internal quotation marks omitted.) *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, supra, 228 F.3d 88. Section 1755 is entitled "[s]tate jurisdiction over reservation" and provides: "Notwithstanding the provision relating to a special election in section 406 of the [Indian Civil Rights Act], the reservation of the Tribe is declared to be Indian country subject to State jurisdiction to the maximum extent provided in title IV of such Act . . . ." On the one hand, we note that § 1755 does not expressly supplant § 1151, nor does it indicate that it is defining Indian country, although the settlement act does define several other land related terms. See 25 U.S.C. § 1752. Indeed, because the definition of Indian country is so well established under federal law, one might expect that the settlement act would have provided something to the effect that, for purposes of the act, Indian country is, or includes only, the reservation of the tribe.[19] On the other hand, a question arises as

---

[19] A simple logical analysis of the defendant's argument exposes its weakness: it is a question of the converse. To assert that all judges are attorneys is not to say that the converse is true, that all attorneys are judges. Similarly,

to why Congress would indicate that the tribe's reservation is Indian country if not intending to limit the meaning of Indian country because a reservation is only one of three ways of establishing Indian country under § 1151. See footnote 1 of this opinion. There are two reasonable explanations.

First, a "reservation" appears to have a broader meaning under the settlement act than that under § 1151 because, under the former, it includes not only the tribe's historic reservation, but also settlement lands taken into trust. Second, and more significantly, the meaning of the phrase "the reservation of the tribe is declared to be Indian country" becomes clear when read, as we are required to do, in the context of the statute as a whole, rather than in isolation. See *Food & Drug Administration* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000) ("[A] reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. . . . It is a fundamental canon of statutory construction that the words of a statute must

the provision that the reservation is Indian country does not necessarily mean that the two are coextensive and that Indian country is only the reservation. Rather, the defendant asks that we find the phrase "the reservation of the Tribe is declared to be Indian country" to mean that "the reservation of the Tribe is declared to be the *only* Indian country." (Emphasis added.) This, however, logically cannot be said to be the plain meaning of the statutory language. To the extent that the language could be construed to prescribe the limits of Indian country *under the settlement act*, there is nothing in the act to preclude the tribe from establishing Indian country outside its reservation, if it is able to meet the criteria under § 1151. See *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, supra, 228 F.3d 90 (concluding that section of settlement act providing government shall not have trust responsibility over nonsettlement lands purchased with settlement funds did not preclude tribe from applying to have government hold such lands purchased with tribe's own funds in trust under generally applicable trust process pursuant to 25 U.S.C. § 465).

be read in their context and with a view to their place in the overall statutory scheme." [Citation omitted; internal quotation marks omitted.]).

Section 1755, when read as a whole, reflects that it addresses state jurisdiction over the reservation, conferring such jurisdiction to "the maximum extent" provided under those sections of the Indian Civil Rights Act that specifically address the state's jurisdiction over criminal offenses and civil causes of action. See 25 U.S.C. §§ 1321 through 1326.[20] The Indian Civil Rights Act provides a mechanism to alter the general rule that the tribe and the federal government exercise concomitant jurisdiction over Indian country occupied by the tribe. See 25 U.S.C. §§ 1321 through 1326; see also *Alaska* v. *Native Village of Venetie Tribal Government,*

---

[20] For example, 25 U.S.C. § 1321, entitled "Assumption by State of criminal jurisdiction," provides: "(a) Consent of United States; force and effect of criminal laws

"The consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians *in the areas of Indian country* situated within such State to assume, with the consent of the Indian tribe occupying the *particular Indian country* or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such *Indian country* or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within *such Indian country* or part thereof as they have elsewhere within that State.

"(b) Alienation, encumbrance, taxation, and use of property; hunting, trapping, or fishing

"Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." (Emphasis added.)

522 U.S. 520, 527 n.1, 118 S. Ct. 948, 140 L. Ed. 2d 30 (1998) (*Venetie*) ("[g]enerally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States"). Under the Indian Civil Rights Act, however, a tribe occupying Indian country may, pursuant to a special election, consent to a state's exercise of jurisdiction over civil and criminal offenses. 25 U.S.C. § 1326. Section 1755 of the settlement act simply provides that the tribe and the federal government agree to allow the state to exercise jurisdiction over criminal offenses and civil actions, without a special election, over its reservation lands, including settlement lands held in trust by the United States. See *State* v. *Spears*, 234 Conn. 78, 88–94, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).

Section 1755 appears to reflect a compromise between the tribe and the state in that the tribe waived its right to withhold criminal and civil jurisdiction from the state over reservation lands in exchange for having available private settlement lands purchased, taken into trust and thereby added to its reservation. It does not address the jurisdictional issue presented here, where the tribe obtained title to the Coachman property with nonsettlement moneys, the federal government had not yet taken the lands into trust and, accordingly, the tribe was not entitled to claim reservation status of that land. As the Second Circuit recognized, "[t]he [s]ettlement [a]ct was not . . . a comprehensive statute intended to settle once-and-for-all the extent of the [tribe's] sovereignty." *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, supra, 228 F.3d 90. Thus, absent a clear statement to the contrary, we will not presume that the settlement act was intended to be a resolution of all jurisdictional claims between the state and the tribe, even those that arise after and apart from the settlement act.

Indeed, such a construction would contravene basic rules of construction previously noted that are applicable to Indian sovereignty. "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." (Internal quotation marks omitted.) Id., 92; accord *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter*, supra, 217 Conn. 620 (ambiguities in statutes concerning dependent tribes to be resolved in favor of tribe).

Accordingly, we conclude that § 1755 simply provides a limited waiver of the tribe's jurisdiction, notwithstanding the provision of the Indian Civil Rights Act that otherwise would limit the state's adjudicatory jurisdiction to "Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose."[21] 25 U.S.C. § 1326. Therefore, the generally applicable definition of Indian country set forth in § 1151 is not necessarily inconsistent with the settlement act, and, thus, it is this definition that will inform our analysis as we decide whether the Coachman property qualified as Indian country prior to being taken into trust.

C

With the enactment of § 1151, "Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States."[22] *Oklahoma Tax Commission* v.

---

[21] The Second Circuit Court of Appeals found "only ambiguity, contradiction, and silence" in the legislative history of the settlement act as to whether nonsettlement lands may be taken into trust if purchased with nonsettlement moneys. *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, supra, 228 F.3d 91. We have found it similarly so with respect to the definition of Indian country.

[22] Prior the enactment of § 1151, "[I]ndian lands were judicially defined to include *only* those lands in which the Indians held some form of property interest. . . . In 1948, however, with the enactment of the statutory definition of Indian country, Congress uncouple[d] reservation status from Indian

*Sac & Fox Nation,* supra, 508 U.S. 123. It is undisputed that the Coachman property did not qualify as a formal reservation prior to being taken into trust or as an allotment.[23]

We therefore consider whether the property qualified as a dependent Indian community under § 1151 (b)

ownership, and statutorily define[d] Indian country to include lands held in fee by non-Indians *within* reservation boundaries. . . . Thus, the mere conveyance of reservation property to non-Indians does not necessarily disestablish the reservation boundaries for jurisdictional purposes." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Thompson* v. *Franklin,* 15 F.3d 245, 250 (2d Cir. 1994).

[23] To the extent that the plaintiff claims alternatively that the Coachman property constituted an informal reservation before being taken into trust, we note that she has offered no independent analysis of that term and has limited her argument to the meaning of a dependent Indian community. We further note, however, that it appears that the test for informal reservations under 18 U.S.C. § 1151 (a) and for dependent Indian communities under § 1151 (b) requires the same analytical framework. The Tenth Circuit explained in this regard: "The test Justice Thomas announced for 18 U.S.C. § 1151 (b) Indian Country (dependent Indian community) in [*Alaska* v. *Native Village of Venetie Tribal Government,* supra, 522 U.S. 520] . . . correspond[s] with the factors Chief Justice Rehnquist articulated in [*Oklahoma Tax Commission* v. *Citizen Band, Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 111 S. Ct. 905, 112 L. Ed. 2d 1112 (1991)] as establishing Indian Country under 18 U.S.C. § 1151 (a) (reservation) when there is no formal reservation. In both instances, the [c]ourt looked for federal set aside and superintendence. See [*Alaska* v. *Native Village of Venetie Tribal Government,* supra, 527]; [*Oklahoma Tax Commission* v. *Citizen Band, Potawatomi Indian Tribe of Oklahoma,* supra, 511]. Thus, the relationship between informal reservations and dependent Indian communities is not entirely clear under current case law. But based on Justice Thomas' holding, '[dependent Indian community] refers to a limited category of Indian lands that are neither reservations nor allotments' . . . and the [c]ourt's earlier pronouncements such as, 'Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States' . . . both dependent Indian communities and reservations, whether formal or informal, continue to exist under 18 U.S.C. § 1151 and Supreme Court jurisprudence." (Citations omitted.) *United States* v. *Roberts,* 185 F.3d 1125, 1133 (10th Cir. 1999), cert. denied, 529 U.S. 1108, 120 S. Ct. 1960, 146 L. Ed. 2d 792 (2000); but cf. *State.* v. *Romero,* 135 N.M. 53, 58, 84 P.3d 670 (App. 2003) (differentiating between terms in that § 1151 [a] does not require link between Indian title and status as. Indian country while § 1151 [b] continues to do so), cert. granted, 135 N.M. 161, 85 P.3d 803 (2004).

before being taken into trust. The term "dependent Indian community" is not defined by statute. Prior to 1998, state and federal courts had developed several different tests, many requiring a "textured balancing test" of several factors.[24] In *Alaska* v. *Native Village of Venetie Tribal Government,* supra, 522 U.S. 530, however, the United States Supreme Court expressly rejected the six factor test employed by the Ninth Circuit and established a two-pronged test requiring, (1) set aside and (2) superintendence. The court explained that "in enacting § 1151 (b), Congress indicated that a federal set-aside and a federal superintendence requirement must be satisfied for a finding of a 'dependent Indian community' . . . . The federal set-aside requirement ensures that the land in question is occupied by an 'Indian community'; the federal superintendence requirement guarantees that the Indian community is sufficiently 'dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question." Id., 530–31. In order to prevail, therefore, the plaintiff must dem-

---

[24] Prior to the decision in *Alaska* v. *Native Village of Venetie Tribal Government,* supra, 522 U.S. 520, this court had held that a "dependent Indian community is 'Indian country' if, (1) there is a bona fide tribe of Indians, and (2) the tribe has inhabited the land, has had 'Indian title' to it since 1790, and has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose." *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter,* supra, 217 Conn. 620; id. (adopting test expressed in *State* v. *Dana,* 404 A.2d 551 [Me. 1979], cert. denied, 444 U.S. 1098, 100 S. Ct. 1064, 62 L. Ed. 2d 785 [1980]). In *State* v. *Sebastian,* 243 Conn. 115, 144–45 n.40, 701 A.2d 13 (1997), cert. denied, 522 U.S. 1077, 118 S. Ct. 856, 139 L. Ed. 2d 756 (1998), we acknowledged that this test had not been applied by any federal court, and that several other Circuit Courts of Appeal had adopted a different test that examined all or some of the following factors: (1) nature of the area; (2) the relationship of the inhabitants in the area to the Indian tribes and the federal government; and (3) the established practice of government agencies toward that area. We now follow the test laid out by the United States Supreme Court in *Venetie.*

onstrate that the Coachman property satisfies both of these requirements.[25]

We begin and end with the issue of whether the plaintiff has met her burden of proof with respect to the first requirement, the set aside. The plaintiff claims that the Coachman property was set aside by the federal government for the tribe by virtue of the fact that it is within the area designated by the settlement act as settlement lands to be added to the tribe's reservation. Therefore, according to the plaintiff, although the Coachman property was not part of the reservation before being taken into trust, it nonetheless was part

---

[25] We note that the Tenth Circuit continues to apply a "community of reference" analysis prior to determining whether land qualifies as a dependent Indian community under the set aside and supervision requirements of the test set forth in *Alaska* v. *Native Village of Venetie Tribal Government,* supra, 522 U.S. 530. Prior to that case, the Tenth Circuit had established a two step process known as the *Watchman* test for evaluating an assertion of dependent Indian community status: the first step requiring an analysis of whether the area proposed as a dependent Indian community is appropriate as a community of reference, and the second step requiring application of a four factor test to the community of reference in order to determine if that community is indeed a dependent Indian community. See *United States* v. *Adair,* 111 F.3d 770, 773–74 (10th Cir. 1997), citing *Pittsburgh & Midway Coal Mining Co.* v. *Watchman,* 52 F.3d 1531, 1542–45 (10th Cir. 1995). After the United States Supreme Court's decision in *Venetie,* the Tenth Circuit concluded that, although *Venetie* may require some modification of the four factor balancing in the second step of the *Watchman* test, *Venetie* did not alter the propriety of *Watchman's* first step—the determination of the proper community of reference. *HRI, Inc.* v. *Environmental Protection Agency,* supra, 198 F.3d 1249 ("[b]ecause *Venetie* does not speak directly to the issue . . . *Watchman* . . . continues to require a 'community of reference' analysis prior to determining whether land qualifies as a dependent Indian community under the set-aside and supervision requirements"); cf. *State* v. *Frank,* 132 N.M. 544, 52 P.3d 404 (2002) (declining to incorporate community of reference inquiry into state's case law). In *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter,* supra, 217 Conn. 619, this court declined to follow the test established for determination of the existence of a dependent Indian community then adopted by the Tenth and Eighth Circuits, finding indiscriminate application of their tests to Eastern Indian tribes inappropriate. Because we never adopted a community of reference test, we do not now import one into our *Venetie* analysis.

of a set aside and hence part of a dependent Indian community once the tribe purchased the property. The defendant responds that the private settlement lands were not set aside, but, rather, that funds were set aside for the purchase of land to be taken automatically into trust under the terms of the act. Accordingly, the designation of private settlement lands under the act had no import after the settlement funds were exhausted unless property within the private settlement lands had been purchased with the funds and automatically taken into trust. The defendant also challenges the plaintiff's construction of the settlement act on the ground that it would result in a patchwork of jurisdictional authority, with the state having jurisdiction over private settlement lands taken into trust but lacking jurisdiction over private settlement lands not taken into trust. We agree with the defendant that the Coachman property was not set aside.

As we have noted previously, to qualify under the "limited category" of land that constitutes a dependent Indian community, the land "must have been set aside by the Federal Government for the use of the Indians as Indian land . . . ." *Alaska* v. *Native Village of Venetie Tribal Government*, supra, 522 U.S. 527. "[L]and is 'validly set apart for the use of Indians as such only if the federal government takes some action indicating that the land is designated for use by Indians.' *Buzzard* [v. *Oklahoma Tax Commission*, 992 F.2d 1073, 1076 (10th Cir. 1993)]." *Narragansett Indian Tribe of Rhode Island* v. *Narragansett Electric Co.*, 89 F.3d 908, 915 (1st Cir. 1996). "The underlying purpose of the federal set-aside requirement is two-fold: (1) it ensures that the land in question is occupied by an Indian community . . . and (2) it reflects the fact that because Congress has plenary power over Indian affairs . . . some explicit action by Congress (or the Executive, acting under delegated authority) must be taken to create or

to recognize Indian country." (Internal quotation marks omitted.) *Thompson* v. *Franklin*, 127 F. Sup. 2d 145, 153 (N.D.N.Y. 2000), quoting *Alaska* v. *Native Village of Venetie Tribal Government*, supra, 531 n.6.

Although the precise circumstances necessary to satisfy a set aside have not been clearly delineated by the courts, prior case law examining the issue provides some illumination on the matter. For example, land accepted into trust pursuant to § 465 of the Indian Reorganization Act is "set apart for the use of Indians by the federal government because it can be obtained only by filing a request with the Secretary of the Interior . . . who must consider, among other things, the Indian's need for the land . . . and the purposes for which the land will be used . . . . If the request is approved, the United States holds the land as trustee." (Citations omitted; internal quotation marks omitted.) *United States* v. *Roberts*, 185 F.3d 1125, 1132 (10th Cir. 1999), cert. denied, 529 U.S. 1108, 120 S. Ct. 1960, 146 L. Ed. 2d 792 (2000); id. (noting that "trust status can demonstrate both federal set aside and superintendence"). A set aside was recognized when Congress required land to be taken into trust that was acquired with a lump sum fund designated for the acquisition of *unspecified* land for the use and benefit of a particular tribe. *HRI, Inc.* v. *Environmental Protection Agency*, supra, 198 F.3d 1251–53. Similarly, land was found to be validly set aside when the federal government held in trust land designated as an Indian "colony," which had been purchased with funds appropriated by Congress to establish a permanent settlement for tribes scattered across the state of Nevada, under the government's supervision, with the specific intent to afford the tribal members the same protection as that given to members living in settlements that constitute reservations. See *United States* v. *McGowan*, 302 U.S. 535, 537 and n.4, 58 S. Ct. 286, 82 L. Ed. 410 (1938).

A set aside also has been found in the absence of a trust relationship. Indian pueblos scattered across 17,000 acres in New Mexico were deemed to constitute a dependent Indian community when they were held in communal, fee simple ownership under grants from the King of Spain made during the Spanish sovereignty, Congress confirmed by statute the tribe's ancestral title after the acquisition of that territory by the United States, and public lands adjacent to several of the pueblos had been reserved by executive orders for tribal use and occupancy. See *United States* v. *Sandoval*, 231 U.S. 28, 39, 48–49, 34 S. Ct. 1, 58 L. Ed. 107 (1913).[26]

By contrast, a court found no valid set aside with respect to land on which a school was situated for the exclusive purpose of educating Native American children, when the land was owned by the federal government, exclusively administered by the Bureau of Indian Affairs and no tribal government had authority to determine the use of land or to transfer the land. See *United States* v. *M.C.*, 311 F. Sup. 2d 1281, 1295 (D.N.M. 2004).[27] Similarly, a court determined that there was no intent to set aside land even when a tribe received fee title to land to be used for Indian housing, the tribe had a pending petition for the government to take the land into trust, the land was situated adjacent to settlement lands already taken into trust pursuant

---

[26] We note that the historical and revision notes to the enactment of § 1151 indicate that Congress based the definition of Indian country upon *United States* v. *Sandoval*, supra, 231 U.S. 28, and *United States* v. *McGowan*, supra, 302 U.S. 535.

[27] Although the New Mexico Court of Appeals reached the opposite conclusion with respect to the same land; *State* v. *Dick*, 127 N.M. 382, 981 P.2d 796 (App.), cert. granted, 127 N.M. 391, 981 P.2d 1209 (1999), cert. quashed, 129 N.M. 208, 4 P.3d 36 (2000); the federal District Court rejected that conclusion, holding that because the state appeals court had failed to apply properly the test required under the Tenth Circuit case law for making that determination and further noting that the federal government had taken the opposite position in that case that the land was Indian country. *United States* v. *M.C.*, supra, 311 F. Sup. 2d 1287, 1297.

to a settlement agreement adopted by Congress, and the United States Department of Housing and Urban Development had recognized the tribe's housing authority and had provided financing for both the land purchase and the housing project. See *Narragansett Indian Tribe of Rhode Island* v. *Narragansett Electric Co.*, 89 F.3d 908, 911, 919–22 (1st Cir. 1996).

Turning to the case at hand, several aspects of the settlement act reflect that, once the settlement funds were disbursed and any available property within the private settlement lands had been purchased with those funds prior to the disbursement, the settlement act did not ensure that the remaining private settlement lands such as the Coachman property, were occupied by, and hence set aside for, the tribe. Indeed, in many if not all respects, the tribe's relationship thereafter to the remaining property in the private settlement lands was no different than any other potential private land purchaser.[28] First and foremost, the settlement act extinguished the tribe's aboriginal or tribal title[29] to any of the private settlement lands as a condition of receiving

---

[28] The plaintiff asserts as evidence of the federal government's superintendence over the Coachman property that the nonintercourse provisions of the Trade and Intercourse Act of 1790; 25 U.S.C. § 177; barred the tribe from conveying that property, even before it was taken into trust, without the government's consent. If the plaintiff is correct, then the tribe obviously would not be situated identically to a nontribal owner of private settlement lands. We do not reach any conclusion as to this assertion, however, in light of our resolution of the set aside issue.

[29] Aboriginal or tribal title "refers to the right of the original inhabitants of the United States to use and occupy their aboriginal territory. . . . It exists at the pleasure of the United States, and may be extinguished by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise. . . . Extinguishment terminates corresponding use and occupancy rights . . . except where such rights are expressly or impliedly reserved in a treaty, statute or executive order." (Citations omitted; internal quotation marks omitted.) *Confederated Tribes of Chehalis Indian Reservation* v. *Washington*, 96 F.3d 334, 341 (9th Cir. 1996).

the settlement fund. See 25 U.S.C. § 1753.[30] Therefore, any subsequent claim to tribal title would have to arise as a result of some other grant under the settlement act or some circumstance after the passage of the settlement act, neither of which exists.

Second, the act provided a limited window of opportunity for the tribe to use the settlement fund to obtain private settlement lands. The settlement act mandates that "[n]ot less than $600,000 of the [$900,000 settlement fund] shall be available until January 1, 1985, for the

---

[30] Section 1753 of title 25 of the United States Code provides in relevant part: "(a) Approval and ratification of prior transfers

"Any transfer before October 18, 1983, from, by, or on behalf of the Tribe or any of its members of land or natural resources located anywhere within the United States, and any transfer before October 18, 1983, from, by, or on behalf of any Indian, Indian nation, or tribe or band of Indians of land or natural resources located anywhere within the town of Ledyard, Connecticut, shall be deemed to have been made in accordance with the Constitution and all laws of the United States, including without limitation the Trade and Intercourse Act of 1790 . . . and all amendments thereto and all subsequent reenactments and versions thereof, and Congress hereby does approve and ratify any such transfer effective as of the date of said transfer.

"(b) Extinguishment of title

"By virtue of the approval and ratification of a transfer of land or natural resources effected by subsection (a) of this section, any aboriginal title held by the Tribe or any member of the Tribe, or any other Indian, Indian nation, or tribe or band of Indians, to any land or natural resources the transfer of which was approved and ratified by subsection (a) of this section shall be regarded as extinguished as of the date of such transfer.

"(c) Extinguishment of claims

"By virtue of the approval and ratification of a transfer of land or natural resources effected by this section, or the extinguishment of aboriginal title effected thereby, any claim (including any claim for damages for trespass or for use and occupancy) by, or on behalf of, the Tribe or any member of the Tribe or by any other Indian, Indian nation, or tribe or band of Indians, against the United States, any State or subdivision thereof or any other person which is based on—

"(1) any interest in or right involving any land or natural resources the transfer of which was approved and ratified by subsection (a) of this section, or

"(2) any aboriginal title to land or natural resources the extinguishment of which was effected by subsection (b) of this section,

"shall be regarded as extinguished as of the date of any such transfer. . . ."

acquisition by the Secretary [of the Interior] of private settlement lands." 25 U.S.C. § 1754 (b) (2). After the lapse of this limited period—between the October, 1983 enactment of the act and the January, 1985 deadline— all unused funds were to be disbursed to the tribe for economic development purposes. 25 U.S.C. § 1754 (b) (3). Once the January, 1985 deadline lapsed and funds were disbursed, the act provided that "the United States shall have no further trust responsibility to the Tribe or its members with respect to the sums paid, any subsequent expenditures of these sums, or any property *other than private settlement lands or services purchased with these sums.*" (Emphasis added.) 25 U.S.C. § 1754 (b) (5). In marked contrast, under the Massachusetts' Wampanoag Tribal Council of Gay Head, Inc., Indian Claims Settlement Act of 1987; 25 U.S.C. §§ 1771 through 1771i; Congress "appropriated $2,250,000 for such fund to remain *available until expended.*"[31] (Emphasis added.) 25 U.S.C. § 1771a (b).

The settlement act does not mandate, however, that the Secretary of the Interior purchase the private settle-

---

[31] Between 1978 and 1994, the federal government formally sanctioned numerous settlement agreements between various states and Indian tribes intending to resolve tribal claims clouding title to privately held land, similar to those asserted by the Mashantucket Pequot tribe. See Rhode Island Indian Claims Settlement Act, 25 U.S.C. §§ 1701 through 1716 (enacted September 30, 1978); Maine Indian Claims Settlement Act of 1980, 25 U.S.C. §§ 1721 through 1735; Florida Indian Land Claims Settlement Act of 1982, 25 U.S.C. §§ 1741 through 1749; Wampanoag Tribal Council of Gay Head, Inc., Indian Claims Settlement Act of 1987 (Massachusetts), 25 U.S.C. §§ 1771 through 1771i; Seminole Indian Land Claims Settlement Act of 1987 (Florida), 25 U.S.C. §§ 1772 through 1772g; Puyallup Tribe of Indians Settlement Act of 1989 (Washington), 25 U.S.C. §§ 1773 through 1773j; Mohegan Nation of Connecticut Land Claims Settlement Act of 1994, 25 U.S.C. §§ 1775 through 1775h. To the extent that we cite to any of these settlement acts, we do not intend to suggest whether any of these other acts would in fact establish the set aside required for a dependent Indian community. We cite to them merely to illustrate by contrast the shortcomings of the present settlement act with regard to satisfying the set aside requirement with respect to lands not held in trust.

ment lands within the specified period, nor does it mandate that the tribe apply to use the funds for such a purpose. Compare 25 U.S.C. § 1752 (3) (defining private settlement lands solely by reference to map with no express purchase requirement) with 25 U.S.C. § 1702 (d) (under Rhode Island Indian Claims Settlement Act, " 'private settlement lands' means approximately nine hundred acres of privately held land . . . that *are to be acquired* by the Secretary from certain private landowners" [emphasis added])[32] and 25 U.S.C. § 1724 (a), (c) and (d) (under Maine Indian Claims Settlement Act of 1980, allocating $27 million as "claims settlement fund" and $54 million as "land acquisition fund"; mandating that land acquisition fund be expended for acquiring land or natural resources and "no other purpose"). Indeed, there is no provision for the tribe to acquire an option or a right of first refusal to make the tribe's acquisition of the private settlement lands more likely.

Third, the focus of the settlement act clearly is on the disbursement of the settlement fund, not the purchase of the land.[33] The act fully accounts for use of the settlement fund—if funds are used to purchase property within settlement lands, the property is taken into trust; 25 U.S.C. § 1754 (b) (7); if funds are used to purchase property outside settlement lands, the property is not taken automatically into trust and the tribe holds it in fee. 25 U.S.C. § 1754 (b) (8). Whatever settlement funds that are not used for the purchase of land are designated for economic development. 25 U.S.C. § 1754 (b) (2). By contrast, the act does not address all of the settlement lands in that it makes no provision for private settlement

---

[32] The First Circuit noted in *Carcieri* v. *Norton*, supra, 423 F.3d 45, 50 n.2 (1st Cir. 2005) that, in accordance with the Rhode Island Indian Claims Settlement Act, 900 acres of privately held lands in a designated area were in fact purchased for the tribe's benefit.

[33] See footnote 14 of this opinion for the relevant text of 25 U.S.C. § 1754, which delineates the scope and the use of the fund.

lands that are purchased with nonsettlement moneys, as in the present case. See *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, supra, 228 F.3d 88 (noting that settlement act "does not apply" to property purchased with private or tribal funds, either inside or outside private settlement area). This treatment differs from the Maine Indian Claims Settlement Act of 1980, wherein Congress accounted for all of the land within the designated area by authorizing the Secretary to take into trust not only property within the delineated area, but also property within that area that is purchased by or given to the tribe. See 25 U.S.C. § 1724 (d). The absence of such a provision is telling. Compare *Connecticut ex rel. Blumenthal* v. *United States Dept. of the Interior*, supra, 90 ("We have compared both statutes and find in the Maine Settlement Act an obvious demonstration that Congress knew how to prohibit the Secretary [of the Interior] from taking into trust any lands outside of specifically designated settlement lands. The absence of an analogous provision in the Settlement Act at issue in this case confirms that the Settlement Act was not meant to eliminate the Secretary's power under the [Indian Reorganization Act] to take land purchased without settlement funds into trust for the benefit of the Tribe.").

To the extent that the legislative history can illuminate any plausible ambiguity as to this issue, it shows that the parties were well aware that some of the property owners within the private settlement lands would choose not to sell their property to the tribe within the time allotted, and the agreement was designed to accommodate the nontribal ownership. For example, in a prepared statement presented as part of his testimony before the congressional committee, United States Representative Sam Gejdenson explained that the property owners within the designated area had reserved their right not to sell their property and noted that "not one

homeowner will be displaced." Hearing on Senate Bill Nos. 2294 and S. 2719 before the United States Senate Select Committee on Indian Affairs, 97th Cong., 2d Sess., p. 63 (July 14, 1982); see also 25 U.S.C. § 1754 (b) (9) (land to be acquired only if owner agrees to price and other terms of sale). Similarly, Jackson T. King, Jr., an attorney representing the nontribal property owners of the private settlement lands, explained in a prepared statement: "A few landowners insist on retaining their property, and this has been fully discussed with the tribe and a settlement can be achieved wherein these landowners will be able to retain their property and their title will be cleared by the passage of this legislation. No landowner will lose his or her residence." Hearing on Senate Bill Nos. 2294 and 2719 before the United States Senate Select Committee on Indian Affairs, supra, p. 76. The Coachman property is apparently one of these parcels of land that the owner chose not to sell while settlement funds still were available. In light of the unequivocal evidence before Congress as to holdout landholders within the private settlement lands, we cannot read Congress' failure to provide any mechanism for the tribe to acquire such lands should they later become available as a mere oversight, as the plaintiff suggests.

We are mindful of the statements made on behalf of the tribe indicating that the tribe may have viewed the settlement as an agreement for land, not for money, and that it expected almost all of the settlement lands to be purchased with the allotted funds. See id., p. 77, remarks of Thomas Tureen, legal counsel for the tribe ("For Indians, money is not the same thing as land . . . . This settlement is designed to restore the land base to them with a minimum disruption of the [tribe] or other people."). The tribe's hopes and expectations as to the land, however, are enforceable only to the extent that they are embodied in the settlement act.

Accordingly, the legislative history does not reflect a clear intention by Congress to set aside as Indian country property within the private settlement lands that the nontribal landholders reserved the right not to sell and therefore was not taken into trust.

In sum, the settlement act ratified all property transfers prior to the settlement act, extinguished the tribe's aboriginal title to the private settlement lands, lifted any cloud on the title of the Coachman property, and thereby permitted the owner of that property to convey it to any purchaser for any purpose that the purchaser chose. Put simply, it is too far a stretch to conclude that establishing a finite settlement fund for economic development and land purchase evidences a federal intent to give the tribe presumptive sovereignty over the Coachman property by making it Indian country. "It seems implausible that a tribe could obtain a valid claim to Indian country—and thus presumptive sovereignty rights—over theretofore privately-held lands just by purchasing them"; *Narragansett Indian Tribe of Rhode Island* v. *Narragansett Electric Co.*, supra, 89 F.3d 922; without any opportunity for notice to the state and federal governments or the consequent opportunity to negotiate agreements with respect to jurisdiction over land purchased many years after the settlement fund's allocation for land purchase had expired. See id. Viewed more reasonably, the federal action here at best evidences an intent to assist in the economic development of the tribe and to allow it to acquire those lands within the designated area that the private landholders had agreed to sell to the tribe during settlement negotiations without necessarily incurring a commitment to exercise jurisdiction over all activities on that land, whenever acquired by the tribe, to the presumptive exclusion of state laws. As such, there is no set aside. Thus, to the extent that the state expressed concern about creating a patchwork of jurisdiction under the

plaintiff's construction of the settlement act, our conclusion avoids any such possible implications. In light of this conclusion, we therefore need not determine whether the Coachman property was under the superintendence of the United States before being taken into trust.

## II

The plaintiff also claims that the assessment of state income tax on enrolled members of the tribe living in the state violates the federal constitution, absent the express consent of Congress. Essentially, the plaintiff contends that, even if she did not live in Indian country, the Indian Gaming Regulatory Act; 25 U.S.C. §§ 2701 through 2721 (2000) (gaming act); preempts state law and precludes the imposition of state income taxes on the individual members of the tribe. Specifically, the plaintiff cites: (1) the section of the gaming act, which provides that "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in Class III [gaming] activity"; 25 U.S.C. § 2710 (d) (4); and (2) the compact negotiated by the tribe and the state pursuant to the gaming act, which similarly provides that "[n]othing in this Compact shall be deemed to authorize the State to impose any tax, fee, charge, or assessment upon the Tribe or any Tribal gaming operation except for charges expressly authorized pursuant to Section 11 of the Compact [dealing with costs for State regulatory operations and law enforcement]"; Mashantucket Pequot Tribe-State of Connecticut Gaming Compact, 56 Fed. Reg. 24,996 (May 31, 1991).

This argument merits little discussion based on two fundamental principles set forth by the United States

Supreme Court. First, "absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe* v. *Jones*, 411 U.S. 145, 148–49, 93 S. Ct. 1267, 36 L. Ed. 2d 114 (1973). Thus, unless expressly *prohibited* by federal law, the defendant may impose its income tax on the plaintiff. Second, a tax on tribal members employed by the tribe is not an impermissible tax on the tribe itself. *Oklahoma Tax Commission* v. *Chickasaw Nation*, 515 U.S. 450, 464–67, 115 S. Ct. 2214, 132 L. Ed. 2d 400 (1995).

The plaintiff's argument fails for the simple reason that the gaming act does not expressly preempt state taxation of income received by tribal members from reservation gaming activity. "In the absence of any express provision indicating such an intent on the part of Congress . . . [Supreme Court case law] lead[s] inexorably to the conclusion that the [gaming act] does not preclude the [local taxing authority] from imposing its income tax on the [plaintiffs] during periods when they resided within the state but [outside of Indian country]." (Citations omitted.) *Jefferson* v. *Commissioner of Revenue*, 631 N.W.2d 391, 397 (Minn. 2001), cert. denied, 535 U.S. 930, 122 S. Ct. 1304, 152 L. Ed. 2d 215 (2002), citing *Oklahoma Tax Commission* v. *Chickasaw Nation*, supra, 515 U.S. 450, *White Mountain Apache Tribe* v. *Bracker*, 448 U.S. 136, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980), and *Mescalero Apache Tribe* v. *Jones*, supra, 411 U.S. 145.

### III

Finally, the plaintiff argues that § 12-702 (c) (1)-3 of the Regulations of Connecticut State Agencies; see footnote 6 of this opinion; under which the defendant determined that the plaintiff was not entitled to an exemption as an enrolled member of a federally recog-

nized tribe, is void due to an impermissible delegation of legislative authority to the defendant. This regulation, however, merely codifies federal law. Because we have determined that the plaintiff did not reside in Indian country during the relevant time period and is therefore not exempt from local taxation under the applicable federal law, she is not entitled to the exemption expressed in § 12-702 (c) (1)-3 as a matter of law. We, therefore, are left with no indication of what practical relief would be afforded to the plaintiff should we rule in her favor on this claim. Accordingly, we decline to address it further. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 233 n.24, 828 A.2d 64 (2003).

The judgment is affirmed.

In this opinion the other justices concurred.