# OLD FARMS ASSOCIATES *v.* COMMISSIONER OF REVENUE SERVICES

# LHI, INC. *v.* COMMISSIONER OF REVENUE SERVICES

# TUTTLE ROAD ASSOCIATES *v.* COMMISSIONER OF REVENUE SERVICES
## (SC 17481)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

. . . ."

466

Argued May 18—officially released August 15, 2006

*Sheila A. Huddleston*, with whom were *Louis B. Schatz, Gregory M. Harris* and, on the brief, *Todd D. Doyle*, for the appellants (plaintiff in each case).

*Rupal Shah Palanki*, assistant attorney general, with whom were *Louis P. Bucari, Jr.*, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Opinion*

KATZ, J. The principal issue in this joint appeal is whether a land seller can be assessed a real estate conveyance tax, pursuant to General Statutes §§ 12-494[1] and 12-495,[2] on money paid by the buyer of the property to a builder for the construction of a house built on that land prior to the buyer taking title to the property. The plaintiff land sellers, LHI, Inc. (LHI), Old Farms Associates (Old Farms) and Tuttle Road Associates (Tuttle Road), appeal from the judgment of the trial court rendering summary judgment in favor of the defendant, the commissioner of revenue services (commissioner), in the plaintiffs' tax appeals. In those appeals, the plaintiffs had challenged the commissioner's assessment against them of a real estate conveyance tax on the consideration paid by the buyers to the builders of houses constructed on the land before the improved lots were conveyed to the buyers. The plaintiffs claim that the trial court improperly concluded

---

[1] General Statutes § 12-494 (a) provides in relevant part: "There is imposed a tax on each deed, instrument or writing, whereby any lands, tenements or other realty is granted, assigned, transferred or otherwise conveyed to, or vested in, the purchaser, or any other person by his direction, when the consideration for the interest or property conveyed equals or exceeds two thousand dollars . . . ."

[2] General Statutes § 12-495 provides in relevant part: "The tax imposed by this chapter shall be payable by the person conveying the property upon the recording of each such deed, instrument or writing. . . ."

that: (1) the commissioner could impose the convey-
ance tax on a seller of land for goods and services
supplied by a separate entity that built a house on that
land; and (2) the two part transactions under which the
buyer received the land and house had no legitimate
business purpose. We conclude that the plaintiffs can-
not be assessed a conveyance tax on property for which
they did not receive, either directly or indirectly, any
consideration and when there was a legitimate purpose
for the structure of the transactions that resulted in
consideration being paid to the home builders for the
house. Accordingly, we reverse the trial court's
judgment.

I

The record and the parties' joint stipulation of facts
reveal the following relevant facts and procedural his-
tory. At various times from 1997 through 2001, each
of the plaintiffs engaged in transactions conveying a
residential building lot to a buyer.[3] The lots were part
of a planned community. At the time the plaintiffs con-
veyed each lot to individual buyers, the lots had houses
located on them that were simultaneously conveyed to
the buyers. All of the relevant transactions were
achieved by one of two methods: (1) a combination of
two contracts, the first entitled "Contract for Sale of
Lot" and the second entitled "Construction Agreement
and Assignment of Contract for Sale of Lot"; or (2) a
single, two part, three party contract entitled "Purchase
and Construction Agreement." We explain each method
in turn, as described by the parties' stipulation of facts.

---

[3] Specifically, LHI conveyed residential lots in East Hampton and Deep
River to various buyers from September 1, 1997, through May 31, 2000, and
October 1, 2000, through February 28, 2001. Similarly, Old Farms conveyed
lots in Middletown from February 1, 1998, through May 31, 2000, and Tuttle
Road conveyed lots also located in Middletown from July 1, 1997, though
May 31, 2000.

A

The sale of 83 Morning Glory Drive in Middletown (Morning Glory lot) is representative of the first method. This arrangement involved three parties: a residential land seller, Tuttle Road; a home builder, The Meadows of Riverbend Associates (Meadows Associates); and a buyer, Wieslaw Piskorski. During the relevant period, Tuttle Road was a Connecticut general partnership with its principal place of business at 55 High Street in Middletown. Bessemer Tuttle L.P. (Bessemer Tuttle), a Delaware limited partnership, held a 92.69 percent partnership interest, and Real Estate Service of Connecticut, Inc. (Real Estate Service), held the remaining 7.31 percent interest. Real Estate Service was a Connecticut corporation with its principal place of business also located at the same 55 High Street address as Tuttle Road. Robert Fusari, Sr., and Edward Cole each owned 50 percent of the shares of Real Estate Service. The ownership of Bessemer Tuttle was not specified. The builder, Meadows Associates, was a Connecticut general partnership with its principal place of business also located at 55 High Street. Bessemer Tuttle and Real Estate Service each held a 50 percent interest in Meadow Associates. The buyer, Piskorski, was not related to the seller, Tuttle Road, or the builder, Meadows Associates.

On November 15, 1991, Tuttle Road and Meadows Associates entered into a contract entitled "Contract for Sale of Lot" (first contract). Pursuant to that contract, Meadows Associates agreed to purchase the Morning Glory lot from Tuttle Road for $29,000 on or before April 1, 1994. Specifically, the first contract provided: "The Seller [Tuttle Road] agrees to sell to the Buyer [Meadows Associates], and the Buyer agrees to purchase from the Seller, good and marketable title to [Morning Glory lot], without any buildings or improvements, as shown on [a specified] map . . . ." It also

contained an acknowledgment by Tuttle Road that Meadows Associates intended to construct a house on the lot and a statement of intent that the building *"shall [not] become affixed to the land or be deemed to become realty until after the conveyance* of the Lot [by Tuttle Road]."[4] (Emphasis added.)

Meadows Associates had the right to assign the contract for the sale of the lot, without the consent of Tuttle Road, to any buyer of the house Meadows Associates had constructed thereon. The contract explicitly provided that Tuttle Road disclaimed "any responsibility to any Assignee with respect to the construction of the house" and that, by acceptance of the assignment, the assignee (buyer) released and relieved Tuttle Road of any liability with respect to the construction of the house and agreed to look solely to Meadows Associates for claims or warranties related to the house.

Under the first contract, Tuttle Road had certain obligations pertaining to approval and organization of the planned subdivision, and, if these conditions were not met, either party could terminate the contract. In the event of such a termination, the agreement provided that Tuttle Road "shall have the option of taking title to any buildings or improvements constructed on the Lot by [Meadows Associates] and neither party shall

---

[4] Specifically, paragraph seven of the first contract provides: "Seller acknowledges that Buyer intends to construct a single family residence upon the Lot. Buyer shall have the right during the term of this Agreement, at Buyer's sole risk, to enter upon the Lot for the purpose of such construction and all related activities. The parties acknowledge that it is their intent that no buildings or structures constructed by [Buyer] upon the Lot shall become affixed to the land or be deemed to become realty until after the conveyance of the Lot by Seller. In the event of a default by Buyer under the terms of this Agreement, any buildings or improvements constructed on the Lot by Buyer shall, at the option of the Seller, become the property of the Seller, provided, however, that upon any such election by the Seller, said buildings and improvements shall not be deemed to be affixed to the Lot or be deemed to be part of the realty unless such intention is expressly made by the Seller."

have further rights against the other." Cole signed the first contract on behalf of Meadows Associates in his capacity as vice president of Real Estate Service, and Fusari signed on behalf of Tuttle Road in his capacity as president of Real Estate Service.

On May 21, 1997, Meadows Associates entered into another contract entitled "Construction Agreement and Assignment of Contract for Sale of Lot" (second contract), under which it assigned the previously executed first contract.[5] The second contract provided that Meadows Associates did not make any warranties with respect to the Morning Glory lot other than those set forth in the contract that it was assigning. Pursuant to this second contract, Meadows Associates warranted that it would construct on the lot and deliver to Piskorski a single-family house and improvements on the closing date, September 20, 1997, along with a certificate of occupancy and a mechanic's lien waiver signed by all parties who had supplied labor or materials relating to the lot or the house. The second contract provided that, until the transfer of title to the Morning Glory lot to Piskorski, all of the improvements constructed on the lot by Meadows Associates "shall be deemed personal property which shall be the property solely owned by the builder."

Piskorski agreed under the second contract to pay $172,351 for the lot and the improvements, with $133,010 attributed to the improvements and payable to Meadows Associates and $29,000 attributed to the lot price and payable to Tuttle Road by reference to the first contract.[6] The agreement recognized that Piskorski

---

[5] The stipulated facts do not address the discrepancy between the April 1, 1994 date of sale specified in the first contract and the September 20, 1997 closing date of the second contract.

[6] The stipulation of facts does not account for $10,341 of the sale price paid by Piskorski and therefore does not specify to what these funds were attributed or to which entities these funds were paid. We also note that handwritten changes to the second contract, which is appended to the stipulation of facts as an exhibit, indicate that the amount due to Meadows

would seek a mortgage for the total amount and conditioned the commencement of building on Piskorski obtaining the mortgage in the full amount.

The second contract also contained several conditions addressing the interrelationship of the lot and the house to be constructed thereon. Assignment of the right to purchase the lot explicitly was conditioned on Piskorski's payment in full for the improvements constructed on the lot by Meadows Associates. Moreover, the second contract provided that, if Piskorski was unable to obtain title to the lot from Tuttle Road for any reason, Piskorski would have no obligation to purchase the improvements from Meadows Associates. Similarly, if Meadows Associates was unable to deliver the improvements for any reason, its liability was limited to the return of any payments Piskorski had made, and Piskorski explicitly waived "any and all rights to specific performance." Fusari executed the second contract on behalf of Meadows Associates in his capacity as president of Real Estate Service.

## B

The sale of 77 Falls Landing Road in Deep River (Falls Landing lot) is representative of the second method of conveyance. This transaction involved a single, two part contract entitled "Purchase and Construction Agreement" (two part contract), between the same three types of parties that participated in the first method: a residential land seller, LHI; a home builder, Real Estate Service; and buyers, Michael Kaufman and Alison Kaufman. Like Real Estate Service, LHI is a Connecticut corporation with its place of business located

---

Associates was reduced to $130,850, and the total purchase price was adjusted to $166,850. The explanation for the change is recorded as "seller to pay buyer at time of closing $10,341 (points added to price)." Whether the term seller refers to Meadows Associates or Tuttle Road is unclear; however, we note that Tuttle Road is the only entity referred to as "seller" in the contract.

at 55 High Street in Middletown. As we noted previously, Fusari and Cole have equal ownership shares of Real Estate Service. Respectively, they hold 51 percent and 49 percent of LHI's stock. The Kaufmans were not related to LHI or Real Estate Service.

On June 1, 2000, the three parties executed the two part contract. Under part one of the contract, LHI agreed to convey a residential lot to the Kaufmans for $83,000. Part one further provided that, when the Kaufmans obtained a mortgage commitment as set forth in part two of the contract, LHI would permit Real Estate Service to construct the improvements—a house—described in part two. LHI disclaimed any responsibility for the construction of the house, and the Kaufmans agreed that any claims with respect to the construction were to be made solely against Real Estate Service. The Kaufmans would have no ownership rights in the improvements constructed on the Falls Landing lot until they had taken title to the lot from LHI "at which time said improvements shall be deemed to be and shall become a part of the Lot." Finally, part one of the contract provided that the Kaufmans agreed that they "shall not record this Agreement in the Land Records . . . . In the event [the Kaufmans] violate this provision . . . the act of such recording shall be deemed to be a default . . . and shall render this agreement terminated and null and void at the option of [LHI]."

In part two of the contract, Real Estate Service agreed to build a house for the Kaufmans on the Falls Landing lot owned by LHI. The agreement provided a breakdown of the total combined purchase price of $346,715, with the price of the lot listed as $83,000, payable to LHI, and the price of construction listed as $263,715, payable to Real Estate Service. Pursuant to part two, Real Estate Service was to deliver to the Kaufmans possession of the house it had constructed, as well as a certificate of occupancy, a mechanic's lien waiver signed by all par-

ties who had supplied labor or materials for the improvements, and warranties for any appliances in the house. In addition, the parties acknowledged that, "until the transfer of title to the lot from [LHI] to [the Kaufmans] all improvements constructed on the Lot by [Real Estate Service] shall be deemed personal property solely owned by [Real Estate Service]."

Under the two part contract, the obligation of Real Estate Service to construct the house did not commence until the Kaufmans obtained a mortgage for the combined total purchase price. The Kaufmans' obligations under both parts one and two of the contract likewise were conditioned upon their obtaining the full mortgage. Any failure by the Kaufmans to pay Real Estate Service for the improvements to the land as set forth in part two of the contract also would be considered a breach of part one of the agreement pertaining to the sale of the lot.

Under the two part contract, the parties acknowledged that the two parts were "independent contracts enforceable, respectively, by the appropriate parties thereto"; however, default by the Kaufmans under either part of the agreement was a default under the other. If part two of the contract was terminated by either party due to the Kaufmans' inability to obtain a mortgage, part one would terminate automatically. LHI had no obligation to transfer the lot until the Kaufmans had paid Real Estate Service in full for the construction of the house.[7]

At the closing, the Kaufmans received the deed for the Falls Landing lot, the certificate of occupancy and

---

[7] On June 20, 2000, Century Builders, a division of Real Estate Service, LHI and Angus McDonald, identified as an "architect or engineer," sought a building permit for the improvements to the Falls Landing lot. The permit was issued on July 5, 2000, listing Century Builders as the "applicant" and Real Estate Service as the "owner." Building permits for other Falls Landing lots, the conveyance of which are also at issue in the present matter, list LHI as both the applicant for the building permit and the owner.

the waiver of the mechanic's lien.[8] The deed, executed on January 17, 2001, by Cole on behalf of LHI, recites that consideration of $83,000 was received in return for the transfer of the property described by its boundaries and through reference to maps on file with the town clerk's office. Specifically, the deed gives "the above granted and bargained premises, with the appurtenances thereof . . . ."[9]

As required by federal law, a Form HUD-1 also was prepared in connection with the sale and transfer of the lot. This document lists the " 'contract sales price' " as $349,822.50, an amount corresponding approximately to the combined purchase price of the lot and the improvements by the builder.[10] The document was executed by all three parties, with the same person signing on behalf of both LHI and Real Estate Service.

## C

As we have noted previously, the two transactions described in parts I A and I B of this opinion are repre-

[8] The certificate of occupancy certified that the "buildings and/or land at 77 Falls Landing Road" conformed substantially to the requirements of the relevant codes and approved a two-story, four bedroom dwelling with an attached two car garage for occupancy. The mechanic's lien waiver was signed by all parties who supplied labor or materials for improvements to the lot or for construction of the house.

[9] The deed also provides that the grantor "is well seized of the premises, has a good indefeasible estate in FEE SIMPLE; and has good right to bargain and sell the same in manner and form as is above written; and that the same is free from all encumbrances whatsoever, except as hereinbefore mentioned." Finally, the deed specifies that, as part of the consideration for the premises, the Kaufmans assume certain real estate taxes related to the property, including those on the Municipal Grand List of October 1, 2000. According to an affidavit and exhibits submitted by the commissioner, this list assessed the Falls Landing lot based on the fact that the house on the lot was one-half completed at that time. An assessment increase notice dated January 25, 2001, subsequently was sent to LHI indicating an increase in the assessed value from $34,860 to $190,680. LHI did not contest this tax increase.

[10] The stipulated facts do not address the discrepancy between the total sales price reflected in the two part contract and the total sales price reflected in the Form HUD-1.

sentative of a number of transactions involving the plaintiffs, all of which are subject to the appeal presently before us. In each transaction, the plaintiff seller of the residential lot reported the property to be unimproved land and paid a conveyance tax on the consideration attributable to the sale of the lot, exclusive of the consideration paid to the builder for the construction of the house and improvements to the lot.[11] The commissioner then assessed the seller for a deficiency on its payment of the real estate conveyance tax, claiming an additional tax due on the consideration paid to the builder. Apparently, the commissioner did not attempt to assess the builder for the consideration it received for the improvements to the land, including the house.

Although the plaintiffs individually protested the assessments, the appellate division of the department of revenue services (department) upheld the additional tax. The department reasoned that the contracts to sell the lot and house constituted a single agreement to sell improved land and, pursuant to this court's ruling in *Mandell* v. *Gavin*, 262 Conn. 659, 669, 816 A.2d 619 (2003), a conveyance tax is assessed on the bargained for exchange. The department found that in each case the deed to the land was not delivered until the house was fully constructed and that the purchaser acquired by deed both the land and the house and paid full consideration for both. Therefore, the department concluded that the conveyance tax properly was assessed against the plaintiffs on the entire purchase price.

---

[11] Although the parties have stipulated that the plaintiffs reported the lots to be unimproved, we note that the property sales assessment data form appended as an exhibit to the joint stipulation of facts contained five categories: unimproved land; residential dwelling; residential property other than a residential dwelling; nonresidential property other than unimproved land; and property conveyed by a delinquent mortgagor. On this form, LHI declared the Falls Landing lot to be residential property other than a residential dwelling.

The plaintiffs appealed from the department's decisions to the Superior Court as to each transaction pursuant to General Statutes § 12-554, claiming that the houses and other improvements were personal property and thus not subject to the conveyance tax, and that the department's regulation directed that tax should be assessed based on the consideration paid to the transferor, which would be solely the price of the lot. The trial court joined the appeals, which raised the same legal issues, and the parties then filed cross motions for summary judgment and a stipulation of facts. The trial court rendered judgment in favor of the commissioner, concluding that the real estate conveyance tax imposed under § 12-494 on "consideration for the interest in real property conveyed" attaches to a sale of a lot, as well as the house constructed upon it, even though the lot owner and the builder have agreed that the house should remain personal property at the time of the sale. The trial court first reasoned that, pursuant to *Verna* v. *Commissioner of Revenue Services*, 261 Conn. 102, 108, 801 A.2d 769 (2002), and *Hartlin* v. *Cody*, 144 Conn. 499, 506–507, 134 A.2d 245 (1957), the intentions of the parties to designate the house as personal property, rather than realty, make no difference in determining whether land is improved for purposes of determining how the § 12-494 conveyance tax is applied to a transaction; the condition of the property at the time of the conveyance to the buyer controlled.

The trial court then looked to the representative agreements of the two types of methods for conveying the properties in order to determine whether the transactions should be treated as one conveyance, such that a tax would be assessed on the combined price of the lot and the house, as the commissioner contended. The court noted the interrelationship between the identity of the plaintiffs and the builders as to all of the transactions and found that the two part contract was in the

nature of a joint venture to sell a house and lot as one unit. The court concluded that the contract had no business reason and no economic benefit to the related land seller and builder except to evade the payment of a portion of the conveyance tax, and thus was a means of tax evasion that must be disregarded as a sham.

With respect to the two contract method of conveyance, the court concluded that the first contract between the land seller and the builder created an equitable interest for the builder in the lot, given that both the builder and the seller had an interest in the construction of the house and the sale of the lot to the buyer. The court reasoned that this equitable interest was sufficient to come within the terms of § 12-494 and that, from the standpoint of the commissioner, it makes no difference who pays the conveyance tax as long as the tax was based on the consideration paid by the buyer. Accordingly, the trial court granted the commissioner's motion for summary judgment, denied the plaintiffs' cross motion for summary judgment and rendered judgment for the commissioner. The plaintiffs then appealed from that judgment to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

II

On appeal, the plaintiffs claim that the trial court improperly concluded that the conveyance tax should be based on the total consideration *paid by the buyer* because, under §§ 12-494 and 12-495 and the department's regulation promulgated thereunder, § 12-494-1 of the Regulations of Connecticut State Agencies, the tax is assessed on the consideration *received by the transferor*. Because the plaintiffs as transferors only received payment for the lots, they contend that they may be assessed real estate tax only on that consider-

ation.[12] The plaintiffs also claim that the trial court improperly concluded that the transactions were joint ventures or shams structured only for the purpose of evading conveyance taxes. We conclude that the trial court improperly concluded that the commissioner had proven that the transactions at issue, whereby the plaintiffs and the builders each received consideration as part of a bargained for exchange with a buyer, were without a legitimate business purpose or economic effect. Accordingly, the commissioner properly could assess against the plaintiffs a conveyance tax only on the consideration that they received, which is the payment for the lots.

As a preliminary matter, we set forth the applicable standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing . . . that the party is . . . entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Dark-Eyes* v. *Commissioner of Revenue Services*, 276 Conn. 559, 569–70, 887 A.2d 848 (2006).

---

[12] The plaintiffs claim in the alternative, that the trial court improperly concluded that the deeds conveyed the houses as well as the residential lots. The trial court merely referenced the Kaufmans' deed and the Form HUD-1 prepared in connection with the sale that recited the total purchase price of the property in support of its statement that "[o]ne could not seriously argue that the Kaufmans intended to buy a lot separate and apart from the house, but, rather, the lot improved with a house." We recognize the difficult issues surrounding the methods of the conveyances of the land and the houses in this case; however, we do not read the trial court's reference as an independent ground for the judgment and, therefore, we do not address this issue as it is not pertinent to our analysis.

"In this case, the trial court's determinations were based on a record that consisted solely of a stipulation of facts, written briefs, and oral arguments by counsel. The trial court had no occasion to evaluate the credibility of witnesses or to assess the intent of the parties in light of additional evidence first presented at trial. The record before the trial court was, therefore, identical with the record before this court. In these circumstances, the legal inferences properly to be drawn from the parties' definitive stipulation of facts raise questions of law rather than of fact. . . . Accordingly, our review of the ruling of the trial court in this case is plenary." (Citations omitted; internal quotation marks omitted.) *SLI International Corp.* v. *Crystal*, 236 Conn. 156, 163–64, 671 A.2d 813 (1996).

The plaintiffs' claims raise issues of statutory construction, which also require plenary review. *Dark-Eyes* v. *Commissioner of Revenue Services*, supra, 276 Conn. 570. Although our legislature recently has enacted General Statutes § 1-2z, precluding resort to extratextual sources when the statute is plain and unambiguous, in the present case, neither of the parties claims that §§ 12-494 and 12-495 yield a plain and unambiguous answer to the question of whether the real estate conveyance tax is assessed against the seller of a residential property based on the consideration paid by a buyer to the builder of a house that has been constructed on that land prior to the conveyance of the deed.

Accordingly, our analysis is not limited, and we, therefore, apply "our well established process of statutory interpretation, under which we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to

the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *DeOliveira* v. *Liberty Mutual Ins. Co.*, 273 Conn. 487, 498 n.7, 870 A.2d 1066 (2005).

We emphasize, however, that "[a]long with these principles, we are also guided by the applicable rules of statutory construction specifically associated with the interpretation of tax statutes." *Bell Atlantic NYNEX Mobile, Inc.* v. *Commissioner of Revenue Services*, 273 Conn. 240, 251, 869 A.2d 611 (2005). In the present case, §§ 12-494 and 12-495 address the imposition of a tax. "[W]hen the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner and in favor of the taxpayer."[13] (Internal quotation marks omitted.) *Andersen Consulting, LLP* v. *Gavin*, 255 Conn. 498, 511, 767 A.2d 692 (2001).

Mindful of these rules of construction, we begin our analysis with a review of the applicable statutory and regulatory scheme. Section 12-494 (a) imposes a real estate conveyance tax "on each deed, instrument or writing, whereby any lands, tenements or other realty is . . . transferred . . . to . . . [a] purchaser, or any other person by his direction, when the consideration

---

[13] It is equally well established that when a taxpayer is challenging an assessment before the trial court, it is a de novo proceeding at which the taxpayer bears the burden of establishing that the assessor has overassessed the property. At such a proceeding, "[t]he trier of fact must arrive at his own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value." (Internal quotation marks omitted.) *Ireland* v. *Wethersfield*, 242 Conn. 550, 556, 698 A.2d 888 (1997). Because this case does not involve a claim of overassessment, but, rather, a determination of how the § 12-494 conveyance tax is applied to a transaction, which involves a question of law, that principle does not apply.

for the interest or property conveyed equals or exceeds two thousand dollars . . . ." It is undisputed that this language requires that there be "consideration for" the transfer of real property before the real estate conveyance tax may be imposed. Section 12-495 in turn provides that this tax on the consideration "shall be payable by the person conveying the property . . . ." In the present transactions, however, there were two entities who received payment for what was conveyed to the buyer.

Therefore, we turn to the legislative history of § 12-494 (a) to provide further insight into the meaning of "consideration" taxable under § 12-494. "Prior to 1971, General Statutes (Sup. 1969) § 12-494, the predecessor statute of § 12-494 (a), imposed the real estate conveyance tax even in the absence of consideration if the *value of the interest or property conveyed* exceed[ed] [the statutory amount]. . . . In 1971, the legislature amended § 12-494 to impose the tax only where there is consideration for the transfer of real estate, thus eliminating the alternative of taxing the value of the property conveyed in the absence of consideration. See General Statutes (Rev. to 1971) § 12-494. An examination of the floor debate in 1971 reveals that the legislators considered a system of taxation for transfers in the absence of consideration, based on the fair market value of the property conveyed, to be fundamentally unfair. In those proceedings, Senator Edward S. Rimer stated: [T]his amendment . . . changes the system of taxation on the [r]eal [e]state conveyance tax so that it would be based now on actual consideration or [the] sale price of the property involved. Rather than the existing situation where the tax is based upon a fair market value. . . . 14 S. Proc., Pt. 3, 1971 Sess., pp. 1037–38." (Emphasis in original; internal quotation marks omitted.) *Mandell* v. *Gavin*, supra, 262 Conn. 670–71. Accordingly, under the amended statute, the

consideration referred to in § 12-494 is a bargained for exchange. Id., 668–69. In other words, the amended statute shifts the focal point from the fair market value of what was received by the buyer to what actually was exchanged by the parties to the transaction.

In 1987, the commissioner promulgated a regulation to further define the consideration that is subject to the tax. Section 12-494-1 of the Regulations of Connecticut State Agencies, defines the consideration subject to taxation[14] as "money and the fair market value of consid-

[14] We note that § 12-494-1 (a) of the regulations defines "full purchase price." For the reasons that we hereafter explain, we presume that this term is equivalent to "consideration." Section 12-494-1 (a) of the Regulations of Connecticut State Agencies provides: " 'Full purchase price' means money and the fair market value of consideration other than money paid or transferred, directly or indirectly, to the transferor, whether or not expressed in the deed, instrument or other writing, and includes, but is not limited to—

"(1) the amount of any liability of the transferor, which liability is assumed by the transferee.

"(2) the amount of any liability to which the realty is subject, but not including the amount of property tax, other municipal assessments, common expense assessments or similar charges which are not yet due and payable and which are subject to customary adjustments.

"(3) in the case of easements, the monetary consideration paid to the transferor at the time of transfer.

"(4) in the case of a lease described in subsection (b) (2) of this section, the fair market value of the realty as of the time of conveyance, as if a fee simple conveyance of the realty had occurred."

When the commissioner promulgated the regulation in 1987, § 12-494 of the General Statutes imposed the conveyance tax based on the "full purchase price" of the transfer or conveyance, and that phrase is mirrored in the regulation. In 1989, the legislature changed the phrase "full purchase price" to "consideration." Public Acts 1989, No. 89-205. Proponents of this change referred to it as technical and explained that it was meant to clarify. See 32 H.R. Proc., Pt. 13, 1989 Sess., pp. 4378–79 (remarks of Representative William J. Cibes, Jr., explaining that term "consideration" is substituted for "full purchase price" because "some people have erroneously concluded that the term full purchase price applies only to transactions where, only to that portion of the consideration where cash is received, and that is not the case"); Conn. Joint Standing Committee Hearings, Finance, Revenue and Bonding Committee, 1989 Sess., p. 54 (letter from Timothy Bannon, commissioner of revenue services, describing change as "technical correction" that "will be less confusing to taxpayers"). Given these remarks and the commissioner's failure to amend the regulation to conform with the

eration other than money *paid or transferred, directly or indirectly, to the transferor . . . .*" (Emphasis added.) Thus, consistent with the 1971 amendment to § 12-494, the regulation focuses even more specifically on what was received by the transferor in money or other consideration, either directly or indirectly.

It is well established that "[w]e presume that [the regulation is] an accurate reflection of the legislative intent in the statute's more general language." (Internal quotation marks omitted.) *Reddy* v. *New Hampshire Ins. Co.*, 28 Conn. App. 145, 157, 612 A.2d 64 (1992). "Regulatory interpretations of statutes are entitled to great weight, especially when the applicable regulations have presumably gone through some form of legislative review."[15] (Internal quotation marks omitted.) *Bodner* v. *United Services Automobile Assn.*, 222 Conn. 480, 496, 610 A.2d 1212 (1992); see also *General Accident Ins. Co.* v. *Wheeler*, 221 Conn. 206, 211, 603 A.2d 385 (1992) (presumption in favor of accuracy of regulation is underscored by Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., which provides for legislative oversight through legislative review committee prior to approval of regulations). Moreover, "[a] regulation's existence for a substantial period of time, although not itself determinative, is persuasive as to its validity." (Internal quotation marks omitted.) *Katz* v. *Commissioner of Revenue Services*, 234 Conn. 614, 623, 662 A.2d 762 (1995). We thus conclude that the regulation is highly persuasive in elucidating the meaning of the statutory language in § 12-494.

---

current statutory term of consideration, we presume that § 12-494-1 (a) of the regulations defines consideration as that term is used in § 12-494 of the General Statutes.

[15] General Statutes § 4-170 provides in relevant part: "(a) There shall be a standing legislative committee to review all regulations of the several state departments and agencies following the proposal thereof . . . .

"(b) (1) No adoption, amendment or repeal of any regulation . . . shall be effective until (A) the original of the proposed regulation . . . [is] submitted . . . [and] (B) the regulation is approved by the committee . . . ."

In the matter presently before us, the regulation makes plain the application of § 12-494 to the facts of this appeal. The conveyance tax is assessed only on consideration *paid to the transferor*. The consideration actually paid to the plaintiffs as sellers of the residential lots in the transactions presently at issue was the price of those lots—an amount on which the plaintiffs already have paid the conveyance tax. It is undisputed that the consideration for the transfer of the houses was paid to the builders. The conveyance tax on the consideration paid to the builders clearly is not properly assessed against the plaintiffs as direct consideration to the transferor under § 12-494-1 (a) of the regulations.[16]

The commissioner does not dispute that the regulation is applicable to the present case, nor does she dispute that, to be subject to the conveyance tax, the consideration must be paid to the transferor. Rather, she emphasizes that the regulation defines consideration to include that which is paid *indirectly* to the transferor. In essence, she concedes that the regulation limits the assessment of the tax to money received by the transferor, but contends that the payments made to the builders were *indirect* payments *to the plaintiffs as transferors* and thus the real estate conveyance tax properly may be assessed against the plaintiffs based on the consideration paid by the buyers to the builders.

This contention leads us to the plaintiffs' second claim, that the trial court improperly concluded that the two part transactions had no legitimate business

---

[16] The commissioner apparently has not sought to assess a conveyance tax against the builders for the consideration they received for the houses that were conveyed to the buyers in these transactions, and we do not address herein whether such an assessment now would be proper. We note, however, that, to the extent that the commissioner may be owed the taxes for the consideration paid for the houses, we disagree with the trial court's assertion that it makes little difference who pays the tax, as long as the commissioner receives the tax for both the land and the houses.

purpose or were shams structured only for the purpose of evading conveyance taxes. The plaintiffs contend that the record does not support the trial court's conclusion that the consideration received by the builders for the houses can be imputed properly to them as the land sellers. We agree.

It is important to underscore at the outset that the commissioner never has claimed that the builders received the consideration at issue without providing something of legitimate value to the buyer of the improved property.[17] Moreover, it is undisputed that the plaintiffs and the builders are separate but related entities. Although the trial court properly noted that there is considerable overlap of ownership in the two entities, neither the trial court nor the commissioner has pointed us to any legal authority that supports the proposition that these facts alone would overcome the legal presumption that separate legal entities are in fact separate. See *Zaist* v. *Olson*, 154 Conn. 563, 573–74, 227 A.2d 552 (1967). Accordingly, we turn to the record.

The record before us reflects a division of responsibilities, risks and liabilities between related but *separate* entities, the builders and the plaintiff land sellers. The plaintiffs purchased the land, tying up investment capital, and assumed the risk associated with the ownership

---

[17] We recognize that one cannot avoid taxation by entering into a contractual arrangement whereby the money is diverted to some other person or entity that has not done anything in return solely to avoid tax consequences. See *Lucas* v. *Earl*, 281 U.S. 111, 114–15, 50 S. Ct. 241, 74 L. Ed. 731 (1930) (wherein taxpayer entered into contract with his wife entitling her to one half of any income he might earn in future and thereafter reported only one half of his income, on belief that taxpayer was accountable only for income actually received by him; court, unwilling to accept that reasonable construction of tax laws permitted such easy deflection of income tax liability, held that taxpayer was to be taxed for entire amount of his income). As we explain in this opinion, because the consideration at issue in the present case went to the builder, a separate entity, for the houses it had constructed, we do not run afoul of this rule.

of the lots. The builders, on the other hand, were responsible under the agreement for obtaining materials and managing labor. They bore the burden of complying with the relevant building codes and regulations.[18] They bore the risk of loss and were responsible for all liabilities arising out of the construction. Moreover, the builders alone were exposed to the potential liability, extending into the future, for any construction flaws that subsequently manifested.

Simply put, in order to establish that she is entitled to assess the plaintiffs for the consideration paid to the builders in light of § 12-494-1 (a), which requires that we look to the consideration actually received by the transferor, the commissioner must establish that the consideration should be treated *as if* it had been paid to the plaintiffs as transferors. The trial court concluded that the transactions were shams based on its determination that they were designed solely to evade taxes. Accordingly, the trial court reasoned that it made no difference who paid the tax as long as it was based on the total amount of consideration paid by the buyer. As we previously have indicated, there are legitimate reasons relating to the desire to allocate risks and responsibilities between the two entities, which are independent of their tax consequences, to structure the transactions in this way. Accordingly, the trial court's determination that the consideration for the house, although paid directly to the builder was, nevertheless, paid indirectly to the plaintiffs because the contract was a sham was improper.

---

[18] For example, Real Estate Service was registered with the department of consumer protection as a new home construction contractor. Moreover, the contract with the Kaufmans obligated Real Estate Service to provide the Kaufmans with certain information pursuant to No. 99-246 of the 1999 Public Acts, which we have noted has been referred to as the "New Home Construction Act." See *Nussbaum* v. *Kimberly Timbers, Ltd.*, 271 Conn. 65, 68, 856 A.2d 364 (2004).

We are not persuaded by the commissioner's reliance on *Raccoon Development, Inc.* v. *United States*, 391 F.2d 610 (Ct. Cl. 1968), which involved the application of the federal documentary stamp tax, enacted in 1954 and formerly codified, in 1958, at 26 U.S.C. § 4361. First, we are not inclined to apply the United States Court of Claims' construction of a federal tax statute to a tax statute enacted by our state legislature. See *Mandell* v. *Gavin*, supra, 262 Conn. 671 ("[t]here is nothing in either the language or the legislative history of § 12-494 [a] to indicate that the legislature intended to adopt any . . . federal regulatory gloss"). As we previously have noted, our legislature amended § 12-494 to limit the tax imposed to the "consideration" paid, in lieu of the previous more expansive fair market value of the conveyance, and the commissioner has defined consideration even more specifically, pursuant to § 12-494-1 (a), as "money and the fair market value of consideration other than money paid or transferred, directly or indirectly, *to the transferor* . . . ." (Emphasis added.) In contrast, the federal taxing statute addressed in *Raccoon Development, Inc.*, assessed a tax on the "consideration or value of the interest or property conveyed . . . ." 26 U.S.C. § 4631 (1958).

Second, the court in *Raccoon Development, Inc.*, implicitly concluded that the facts in that case warranted disregarding the corporate veil of the entities in order to treat the distinct corporations as one when assessing the tax. As a general rule, the courts recognize the separate entities of affiliates and any financially sound transactions between those affiliates. See, e.g., *SLI International Corp.* v. *Crystal*, supra, 236 Conn. 163. Although it is true that, "[c]ourts will disregard the fiction of separate legal entity when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock . . . [t]he circumstance that control is exercised merely through

dominating stock ownership, of course, is not enough. . . . There must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." (Citations omitted; internal quotation marks omitted.) *Zaist* v. *Olson*, supra, 154 Conn. 573–74. "The concept of piercing the corporate veil is equitable in nature and courts should pierce the corporate veil only under 'exceptional circumstances.'" *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 557, 447 A.2d 406 (1982). Moreover, it is the party seeking to pierce the corporate veil that bears the burden of proof. *Season-All Industries, Inc.* v. *R. J. Grosso, Inc.*, 213 Conn. 486, 492, 569 A.2d 32 (1990).

Although there is some overlap between the facts at issue in *Raccoon Development, Inc.*, and those in the present case, the transactions analyzed by the court in *Raccoon Development, Inc.*, are factually distinct in significant respects and, therefore, that court's analysis of the facts before it do not demonstrate that the facts presently before us exhibit the exceptional circumstances required to disregard the separate legal forms of the entities.[19] The sale of lots and prefabricated homes in *Raccoon Development, Inc.*, was accomplished through corporations with one individual functioning as the controlling shareholder and principal officer of every entity; the buyers were unaware that they were dealing with separate companies for the purchase of the land and the house; and various differing

---

[19] We also are not persuaded by the commissioner's contention that the plaintiffs should be subject to the imposition of the conveyance tax for the full consideration paid by the buyer pursuant to our decision in *Verna* v. *Commissioner of Revenue Services*, 261 Conn. 102, 801 A.2d 769 (2002). In *Verna*, we addressed whether certain property was improved or unimproved in order to determine the proper rate of the conveyance tax. Id., 107–10. We did not address against *whom* the tax, at whatever rate, may be assessed.

portions of the total sale price arbitrarily were assigned to the value of the land in different documents.

In contrast, the buyers in the matter presently before us were fully aware that they were dealing with different entities, and, significantly, the liabilities, warranties and responsibilities were divided between the land sellers and house builders accordingly.[20] The price of the lot remained consistent and clearly separated. Finally, the two individuals, Fusari and Cole, whose interests provide a common thread creating some relationship between the plaintiffs and the builders, are not the controlling shareholders and principal officers of all of the corporations and partnerships involved. Although Fusari and Cole share sole ownership and control of one of the plaintiff sellers, LHI, and one of the builders, Real Estate Service, they have a combined interest of less than 14 percent in the general partnership of another of the plaintiff sellers, Old Farms. They also have less than an 8 percent interest in the third plaintiff seller, Tuttle Road, and only a 50 percent interest in the other builder, Meadows Associates. Accordingly, we conclude that the trial court improperly concluded that the payment to the builders could be attributed to the plaintiffs as consideration indirectly paid to them.

We recognize the possibility that neither the legislature nor the commissioner envisioned the two party

---

[20] Indeed, we note that the representative contract between Tuttle Road and Meadows Associates for the sale of the Morning Glory lot provided for the unwinding of the transaction between the separate entities. If Meadows Associates, the builder, defaulted under the terms of the agreement, failing to purchase the land or to assign the contract, then "any buildings or improvements constructed on the lot by [Meadows Associates] shall, at the option of [Tuttle Road] become the property of [Tuttle Road] . . . ." Similarly, Tuttle Road had the option of taking title to any improvements constructed on the lot by Meadows Associates if Tuttle Road was unable to meet specified conditions regarding the planned community. We do not have the agreements between the seller and the builder in the other type of representative agreement.

arrangements at issue in the present case. Nonetheless, we cannot conclude that the result reached herein is absurd. For example, it is not irrational to conclude that each entity to the transaction would pay taxes on the consideration it received so that the builder of the house would be taxed on the consideration that was paid directly to it. Cf. Regs., Conn. State Agencies § 12-494-2 (a) (5) (sale, either by bill of sale or by deed of conveyance, of manufactured mobile home is subject to conveyance tax as measured under § 12-494-1 [a]). On the other hand, the statutory scheme might not assess a conveyance tax on the builders in such arrangements at all in order to encourage development of land otherwise likely to lay fallow or remain blighted. To the extent that the legislature and the commissioner deem the tax losses from such arrangements to outweigh the potential advantages of such development, they may seek to amend the statutory and regulatory scheme or the commissioner may seek to assess the taxes for the house against the builder, if applicable.

Finally, we acknowledge the novel method of conveyance involved in this appeal. We also acknowledge that the plaintiffs and the builders in the transactions before us may not avoid an otherwise applicable conveyance tax simply by virtue of their declaring a house to be "personal property" or "goods and services." *Russell* v. *New Haven*, 51 Conn. 259, 262 (1883) (concluding that building is part of realty and taxable to holder of title to building, when building was not erected for temporary purpose; neither party contemplated its removal; size and character of building, and materials of which it is constructed, precluded idea of removal; and there was contract provision pertaining to purchase of building); see also *Hartlin* v. *Cody*, supra, 144 Conn. 506 (agreement that fixture that was made permanent part of real estate would nonetheless remain personalty may bind parties to agreement but does not bind those out-

side of contract). Clearly, "[t]he conveyance tax due under § 12-494 is triggered by the conveyance of real estate regardless of any conditions agreed to by the parties related to the contract of sale. This is so because the relationship between the taxpayer and the commissioner is governed by statute, not controlled by the agreement of sale between the purchaser and [the] seller. Cf. *Hartford Fire Ins. Co.* v. *Brown*, 164 Conn. 497, 505, 325 A.2d 228 (1973)." *Vigliotti* v. *Commissioner of Revenue Services*, 44 Conn. Sup. 444, 449, 692 A.2d 407 (1996).[21]

Because this case rests upon the application of § 12-494-1 (a), the commissioner as the moving party was required to demonstrate that the plaintiffs had received the consideration paid by the buyers for the homes either directly or indirectly. She could not demonstrate direct payment and we have rejected the trial court's determination that the stipulated facts evidence that the two part transaction whereby the improved lots were conveyed was a sham.[22] Therefore, in accordance

---

[21] In deciding this appeal, we have not commented directly on a number of issues, including whether the title to the houses was conveyed by deeds granting "the above granted premises, with the appurtenances thereof," or by some other instrument such as the representative agreements; whether the conveyances of the houses were properly recorded; and whether the houses, however conveyed, are tenements the conveyance of which is taxable to the transferor pursuant to § 12-494 as elucidated by §§ 12-494-1 (a) and 12-494-2 (a) (5) of the Regulations of Connecticut State Agencies. Resolution of these issues, however, is neither necessary nor relevant to our analysis because we have concluded that § 12-494-1 (a) is applicable and cannot be ignored by the commissioner. When applied, § 12-494-1 (a) makes plain the application of § 12-494 to the facts of this appeal. The conveyance tax is assessed only on consideration *paid to the transferor.*

[22] In seeking summary judgment, the commissioner asserted that the trial court must understand and consider the actualities of the total situation presented by these transactions. We note that although the commissioner could have sought and received full discovery as to the relationship between the sellers and the builders before seeking summary judgment; see, e.g., *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 785, 653 A.2d 122 (1995); she instead submitted the stipulation to the facts discussed herein in support of her motion for summary judgment and asserted that there were no further material facts at issue.

with the reasoning we set forth herein, the plaintiffs were entitled to prevail on their cross motions for summary judgment.

The judgment is reversed and the case is remanded with direction to sustain the plaintiffs' appeals.

In this opinion the other justices concurred.